*Decision will be entered under Rule 50.*

---

FEDERAL CEMENT TILE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 87574, 87686. Filed September 26, 1963.

---

*Thomas Eugene Foster* and *William J. Killbridge*, for the petitioner.
*Seymour I. Sherman*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable years 1953 to 1957, inclusive, in the respective amounts of $196,002.76, $288,146.03, $11,505.26, $111,762.82, and $14,085.74.

Certain issues have been disposed of by stipulation of the parties. The issues remaining for decision are (1) whether the petitioner, which sustained net operating losses in the calendar years 1950, 1951, and 1952 in the conduct of a cement roofing tile business, may carry over and deduct such losses from income earned by it in the years 1953 through 1956 in the conduct of a cement roofing tile business acquired by it by merger in 1953; (2) whether the petitioner is prohibited by either section 24(b) or 129(a) of the Internal Revenue Code of 1939 from deducting losses sustained by it on the sale of certain of its assets in 1953 to individuals who sold their majority stock interest in the petitioner to unrelated third parties, where both transactions were carried out pursuant to simultaneously executed prior agreements; and (3) whether the petitioner may deduct any portion of the amounts paid by it in 1956 and 1957 to its sole corporate stockholder and to the corporation in control of such sole stockholder as compensation for services rendered to it by them.

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner is a corporation organized on September 13, 1946, under the laws of the State of Delaware. It timely filed its income tax returns for the taxable years 1953 to 1957, inclusive, with the district director of internal revenue at Chicago, Ill. For an undisclosed time prior to April 29, 1953, and continuing until May 13, 1953, John D. Dale and Louise B. Dale, husband and wife, owned in excess of 50 percent in value of the petitioner's outstanding stock. They, together with members of their family, owned 69,055 of its 74,405 outstanding common shares and all 2,000 of its outstanding preferred shares.

The petitioner was formed, under the name "Durisol, Inc.," to manufacture and sell lightweight cement roofing tile, using a Swiss invention known as Durisol Aggregate, which employed the use of certain types of wood shavings and chemicals.

The petitioner acquired the exclusive rights in and to the Durisol name and process throughout the United States, Canada, and Mexico from the corporate owner of the basic patent, Durisol Materiaux de Construction Legers, S.A., of Switzerland, hereinafter referred to as Durisol-Swiss, by contract dated October 11, 1946.[1]

On August 25, 1947, representatives of Durisol-Swiss filed in the U.S. Patent Office an application for a patent covering the Durisol process. By an assignment dated April 10, 1948, and recorded in the U.S. Patent Office on April 21, 1948, such persons assigned to the petitioner the full and exclusive right, for the territory of the United States, in and to the invention described in the patent application. On April 8, 1952, U.S. Patent No. 2,592,345 was issued to the petitioner as assignee of the inventors.

From 1946 to May 13, 1953, the petitioner engaged in the manufacture, sale, and installation of cement roofing tiles or slabs, utilizing the Durisol process and methods, in 15 States on or near the East Coast of the United States, with its office in New York, N.Y., and its manufacturing plant and facilities in Beacon, N.Y.

The petitioner consistently sustained operating losses from its inception and for the taxable years 1946 through 1952 it reported on its income tax returns net operating losses in the following amounts:

---

[1] Under the terms of the contract, the petitioner paid for such rights in and to the Durisol name and process an amount of $80,000 and agreed to pay specified royalty payments. The contract provided that if such royalties were not paid within 3 months after the due date Durisol-Swiss should have the right to take over the business covered by the contract and that if they were not paid within 6 months the petitioner would automatically, without notice, lose its rights under the contract. By such contract the petitioner pledged itself to absolute secrecy regarding the Durisol manufacturing process and all plans of machines, tools, and plant placed in its hands.

| Year | Amount |
|------|--------|
| 1946 | $6, 897. 68 |
| 1947 | 43, 412. 53 |
| 1948 | 151, 048. 04 |
| 1949 | 225, 871. 86 |
| 1950 | 172, 221. 61 |
| 1951 | 197, 738. 78 |
| 1952 | 279, 618. 22 |

On or about April 26, 1952, the petitioner's board of directors and its stockholders, approved a resolution that future manufacturing operations of the petitioner be suspended except insofar as necessary to complete the then unfilled contracts, and that the president of the corporation proceed to reduce the personnel and the operating expenses.

At some undisclosed time a Canadian corporation started negotiations with petitioner looking toward the acquisition of the Durisol license for the United States East Coast and the content of the petitioner's factory at Beacon, N.Y., with a view to setting up a factory in Canada.

At some undisclosed time the petitioner advised the union that the factory would not be operated as a Durisol factory after July 1, 1953. On February 24, 1953, the petitioner's stockholders approved a proposed sale of the Beacon factory to Louise B. Dale for $325,000 and the leasing back of the same property, but this transaction was never carried out. At or about the same time the Dales set up a standby corporation for possible future use. This corporation was organized under the laws of New York and was known as Durisol New York Industries Corp., hereinafter referred to as Durisol—N.Y.

On March 25, 1943, there was created under the laws of the State of Illinois a corporation under the name of "The Cement Tile Corporation." Such name was changed in 1944 to "Federal Cement Tile Company." This corporation hereinafter will be referred to as Illinois Federal in order to avoid confusion which would arise by virtue of the fact that its name was the same as the name later adopted by the petitioner. None of the shareholders of Illinois Federal were shareholders of the petitioner prior to May 13, 1953.[2]

[2] The original key executives and shareholders of Illinois Federal, each of whom at the time of incorporation had approximately 25 years of experience in the business of manufacturing cement tiles for roofing purposes, were as follows:

| | Shares of stock held | |
|---|---|---|
| | Common | Preferred |
| Cheri S. Freund, president | 300 | 132 |
| Leland J. Wilhartz, executive vice president | 300 | 132 |
| Arthur Isherwood, sales manager | 100 | 44 |
| Virgil E. Baird, chief engineer | 100 | 44 |
| O. Roy Pritchett, plant superintendent | 100 | 44 |

Illinois Federal engaged in the business of manufacturing, selling, and installing cement roofing tiles or slabs in States located in the Midwest area of the United States, with its office at Chicago, Ill., and its manufacturing plant and facilities partly in Lake County, Ind., and partly in Cook County, Ill., but with its mailing address in Hammond, Ind.

Illinois Federal consistently operated at a profit throughout its corporate existence and reported net income on its income tax returns for its fiscal years ended March 31, 1948, to March 31, 1953, inclusive, as follows:

| Fiscal year | Amount |
|---|---|
| 1948 | $397, 844. 36 |
| 1949 | 338, 331. 97 |
| 1950 | 202, 328. 71 |
| 1951 | 368, 661. 99 |
| 1952 | 552, 540. 96 |
| 1953 [1] | 319, 545. 53 |

[1] Actual operations were only for the 9-month period Apr. 1, 1952, to Dec. 31, 1952.

On August 29, 1952, there was organized under the laws of Illinois a corporation under the name of "S.E.S.," whose stock was held in a voting trust for the benefit of a group known as the Schulman group. Samuel E. Schulman and his family beneficially owned approximately 35½ percent of such stock. The purpose of S.E.S., as stated in its charter, was to deal in personal and real property of all kinds and to engage in the construction and roofing business.

On or about November 26, 1952, S.E.S. acquired all the capital stock of Illinois Federal. The key executives (former stockholders) of Illinois Federal, named in footnote 2, remained with the corporation under new employment contracts covering the period April 1, 1953, to March 31, 1958 (March 31, 1954, in the case of Pritchett), at specified base salaries plus additional amounts of compensation based on gross sales or quantity of product manufactured.

On December 31, 1952, Illinois Federal was completely liquidated into S.E.S., which thereupon changed its name to Federal Cement Tile Co. (not to be confused with the petitioner). Illinois Federal was dissolved on April 30, 1953.

S.E.S. filed an income tax return for the period August 29, 1952, to November 30, 1952, reporting no income or expense, and a return for the period December 1, 1952, to May 31, 1953, reporting gross sales in the amount of $890,303.93, net income in the amount of $48,759.87, and tax paid in the amount of $19,840.31.

At some time after November 26, 1952, the existence of the petitioner (at that time known as Durisol, Inc.) was brought to the attention of Schulman by his attorney. Thereafter Schulman, Wilhartz, and other representatives of Federal Cement Tile Company (the Illinois

corporation) investigated and inspected the product and the operations of the petitioner at both its Beacon factory and its New York offices, examined projects built by the petitioner with the Durisol product, and reviewed the petitioner's financial statements and records and its plant records. These investigations disclosed that the petitioner's cement roofing slab made of Durisol was the same size as the Federal Cement Tile Co.'s cement roofing slab, but that the petitioner's slab was much lighter and had better acoustical and insulating features, and that the petitioner also manufactured a lightweight cement block made of Durisol. The group also found that the petitioner had a backlog of commitments in the form of orders and jobs in process in excess of $1 million. The Schulman group was not interested in obtaining and carrying out these orders and jobs.

On April 29, 1953, Schulman, on behalf of himself and his group, entered into an agreement, denominated "Durisol, Inc., Stock Purchase Agreement," with the Dales for the purchase, no later than May 13, 1953, of all the issued and outstanding stock of the petitioner [3] and certain notes of the petitioner held, or to be held, by the stockholders in the amount of $767,260.12 (including accrued interest thereon in the amount of $32,501.66). The stated consideration for such stock and notes was the sum of $240,000, less certain indebtedness and liabilities of the petitioner (principally current liabilities) which then amounted to $57,133.74.[4]

The agreement recited that the petitioner was also indebted to Louise B. Dale in the principal sum of $325,000, plus interest thereon, evidenced by a note or notes or bond or bonds in that amount and secured by a first mortgage upon the land and plant of the petitioner at Beacon, N.Y., and that the petitioner and Louise B. Dale had agreed that the petitioner would, prior to the closing date, convey such land and building to her in full satisfaction of such indebtedness.

[3] The agreement expressly provided that in the event the Dales were unable to acquire and tender to the Schulman group on the closing date all of the shares of the petitioner not then owned by them, the Schulman group had the irrevocable option within 10 days from such date to purchase and acquire all of the preferred and common shares of the petitioner offered or then owned by the Dales.

[4] Attached to the agreement as exhibit A thereto was the following balance sheet of the petitioner as of Apr. 22, 1953:

ASSETS

| | | |
|---|---|---|
| Cash In Bank: | | |
|     Bankers Trust Co | $10,776.75 | |
|     Fishkill National Bank | 9,768.30 | |
| | | $20,545.05 |
| Accounts Receivable | 49,209.56 | |
| Less: Reserve for doubtful accounts | 11,787.25 | |
| | | 37,422.31 |
| Inventories | | 148,830.54 |
| Prepaid Expenses | | 14,054.62 |
| Fixed Assets—Net as of December 31, 1952 | | 639,773.11 |
| Durisol Process | | 80,000.00 |
| | | 940,625.63 |

In the agreement the Dales represented and warranted that the Federal income and excess profits tax returns filed by the petitioner, including its return for the calendar year 1952, copies of which had been delivered to the Schulman group, were true and correct returns for the periods covered thereby, respectively.

On the same date, April 29, 1953, the Schulman group and the Dales entered into a second agreement, in letter form, which provided that, simultaneously with the closing of the purchase of the petitioner's stock from the Dales, there would be transferred by the petitioner to the Dales, for a purchase price of $75,000, all the petitioner's inventories, all of its machinery and equipment and office furniture and equipment, all of its small tools (with certain specified exceptions), and all insurance policies relating to its fixed assets, machinery and equipment, workmen's compensation, etc., together with all deposits and advances relating thereto. Therein it was agreed that the petitioner would assign to Durisol—N.Y. all of the petitioner's orders and unfilled contracts for buildings to be erected on the East Coast. The Dales agreed to cause Durisol—N.Y. to discharge all of such orders and contracts and to permit Durisol—N.Y. to use the Beacon plant and such of the machinery, equipment, and inventory as was necessary for the purpose; they further agreed to personally indemnify the petitioner against any claims, loss, or damage by reason of such orders or contracts. The Schulman group agreed to cause the petitioner, upon the consummation of the stock purchase, to execute a sublicense to Durisol—N.Y. of the exclusive patent rights covering the Durisol methods in the States on the East Coast, thereby granting, to the extent the petitioner had the right to grant them, all rights which it had in connection with the Durisol product in such area, Durisol—N.Y. to pay such royalties and sums as the petitioner was obligated to pay with respect thereto.

Both of the above agreements were duly carried out. On or about May 12, 1953, the petitioner conveyed its land and building at Beacon, N.Y., to the Dales or their nominee in satisfaction of the indebtedness

LIABILITIES

| | | |
|---|---|---|
| Accounts Payable | $17, 695. 15 | |
| Commissions Payable | 1, 163. 35 | |
| Withholdings from Employees | 11, 459. 28 | |
| Accrued Taxes | 4, 755. 77 | |
| Accrued Expenses | 20, 855. 19 | |
| Truck Purchase—Note | 1, 200. 00 | |
| | | $57, 133. 74 |
| Bank Note Payable | 200, 000. 00 | |
| Stockholders Notes | 534, 753. 46 | |
| Accrued Interest Thereon | 32, 501. 66 | |
| | | 767, 260. 12 |
| Mortgage Payable | | 325, 000. 00 |
| Capital Stock and Deficit | | (208, 768. 23) |
| | | 940, 625. 63 |

owing by the petitioner to Louise B. Dale.[5] On May 13, 1953, the Schulman group received 2,000 shares of preferred stock (par value $100 per share) of the petitioner and 74,405 shares of common stock (par value $1 per share) of the petitioner and notes issued by the petitioner in the principal amount of $734,758.46 (which includes accrued interest in the approximate amount of $32,500), for which such group paid a computed purchase price of $172,408.81. All the assets described in the letter agreement of April 29, 1953, were transferred on or about May 13, 1953. The petitioner, by Schulman as president, executed a bill of sale to the Dales, dated May 13, 1953, of the personal property described in such letter agreement. The petitioner duly entered into an agreement granting to Durisol—N.Y. the right to use the name Durisol in the East Coast States "to the extent" it "has the right to grant * * * such rights"[6] and transferring to it the unfilled orders and contracts.

On May 13, 1953, immediately following the consummation of the agreement of April 29, 1953, the petitioner had assets consisting of cash on hand in the amount of $538.51, accounts receivable in the amount of $37,628.16, cash received from the sale of assets to the Dales of $75,000, and the rights remaining to it in the Durisol process and patent with a book value of $80,000, or a total book value of all of such assets of $193,166.67. At that time the petitioner had current liabilities in the amount of $29,497.17 and other liabilities, consisting of the notes acquired by the Schulman group in the amount of $767,260.12 (including interest).

On or about May 26, 1953, the Federal Cement Tile Co. (formerly S.E.S.) was merged into the petitioner, the latter surviving. As a part of the merger the petitioner changed its name to Federal Cement Tile Co. and changed the par value of the common stock from $1 to $100 per share. After the merger the Schulman group continued to beneficially own the stock of the petitioner as it had owned the stock of the Federal Cement Tile Co. (formerly S.E.S.).[7]

[5] Louise B. Dale later sold this property under contract dated Aug. 25, 1954, for $250,000 cash.

[6] By agreement dated May 12, 1953, the petitioner and Durisol-Swiss modified their contract of Oct. 11, 1946. Therein the petitioner released to Durisol-Swiss all right, title, and interest to the use of the Durisol name and process in Mexico and Canada, the rate of royalties was changed to a flat rate per cubic foot of Durisol sold beginning Jan. 4, 1954, and new rules were provided for the calculation of such royalties. At the same time the petitioner released to Durisol-Swiss all right, title, and interest to the use of the Durisol name and process in the East Coast States. By a contract dated May 13, 1953, Durisol-Swiss granted to Durisol—N.Y. the exclusive right to the use of the Durisol name and process in said East Coast States.

[7] Both prior to and concurrent with the consummation of the purchase by the Schulman group of the stock of the petitioner, Schulman and his attorney and his accountant discussed the possible "availability for a tax credit" of the petitioner's net operating losses for years prior to 1953, and the fact that the petitioner had such net losses was a factor in the closing of the transaction, the fixing of the price which the group paid, and the determination of the form of the transaction. One of the purposes for which the acquisition of the control of the petitioner by the Schulman group was made was to secure the benefit of a deduction which would not otherwise have been enjoyed.

After May 13, 1953, the petitioner did not own or utilize the real estate, operating assets (except the rights retained by it in the Durisol patent and process), and inventory formerly utilized by it in its east coast operations. Prior to May 13, 1953, the petitioner had never utilized or exploited the Durisol process or conducted business outside of the East Coast States. After that date it did not utilize or exploit, or seek to utilize or exploit, the Durisol patent or process in the East Coast States.

Immediately after the merger the petitioner carried on the manufacture and sale of cement roofing tiles, utilizing solely the office and manufacturing facilities previously utilized by Illinois Federal, and with its area of operations limited to the Midwest. Within 2 or 3 months after the acqustion of the stock of the petitioner by the Schulman group, the petitioner commenced efforts to produce a product made with Durisol. The petitioner made substantial investments in connection with its preparation to produce such a product, including consultations with engineering firms, the building and purchase of molds, and the purchase and setting up of a wood crusher, a mixer, conveyor belts, and an overhead gib crane. The petitioner bid on and performed contracts calling for cement roofing made with Durisol. However, the petitioner experienced difficulty in acquiring the proper type of sugar-free woodshavings to be used in the manufacture of the Durisol product and also experienced difficulty with the finished Durisol product, chiefly due to separations in the slab caused by unequal expansion and contraction between the combination of the slab with Durisol, which required the petitioner to make costly corrections. The petitioner made attempts to correct these difficulties but without success. During the approximately 3 years that the petitioner attempted to manufacture and sell the Durisol product, it continued producing the same types of material which had been produced by Illinois Federal and its successors in the midwest business prior to the acquisition of the petitioner's stock by the Schulman group, and sales of the Durisol product represented only a relatively minor part of total sales during this period.

The petitioner discontinued the manufacture of the Durisol product in approximately early 1956, and on December 28, 1956, it sold all of its remaining interest in the Durisol process, patent, and trademark for $1,000.

In its income tax return for the taxable year 1953, the petitioner reported net income (before any net operating loss carryover deduction) of $1,301.89. It claimed a net operating loss deduction of $649,578.61 (consisting of net operating losses which it sustained during the taxable years 1950, 1951, and 1952).

In its return for the taxable year 1954 the petitioner reported taxable income (before any net operating loss carryover deduction) of

$557,597.03. Therein it claimed a net operating loss deduction of $647,119.26 (consisting of the unused portion of the aggregate net operating losses sustained during the taxable years 1950, 1951, and 1952).

It its return for the taxable year 1955 the petitioner reported taxable income (before any net operating loss carryover deduction) of $28,637.50. Therein it claimed a net operating loss deduction in the same amount (being a portion of the unused net operating loss sustained in the taxable year 1952).

In its return for the taxable year 1956 the petitioner reported taxable income (before any net operating loss carryover deduction) of $397,639.61. Therein it claimed a net operating loss deduction of $60,884.73 (representing the remaining unused portion of the net operating loss sustained in the taxable year 1952).

In the notices of deficiency the respondent disallowed the claimed net operating loss deductions for the taxable years 1953 to 1956, inclusive. For the taxable year 1953 the respondent determined that the claimed deduction was not allowable under sections 23(s) and 122 of the Internal Revenue Code of 1939, and held further that it fell within the purview of section 129(a) of such Code. For the taxable years 1954 and 1955 the respondent determined that the claimed net operating loss deductions were not allowable under the provisions of section 172 of the Internal Revenue Code of 1954, and held further that it fell within the purview of section 269(a) of such Code. For the taxable year 1956 the respondent determined that the claimed net operating loss deduction was not allowable under the provisions of section 172 of the 1954 Code.

The business operated by the petitioner during the taxable years 1953 through 1956 was not substantially the same business as that conducted by it in the years 1950, 1951, and 1952 in which it sustained net operating losses.

In its income tax return for the taxable year 1953, the petitioner claimed a deductible loss of $71,397.49 on the disposition of its land and building at Beacon, N.Y., such loss being the difference between the adjusted basis thereof, $396,397.49, and the amount of $325,000. Therein it also claimed a deductible loss of $140,616.83 on account of the sale of the fixed assets to the Dales, such loss being the difference between the adjusted basis of $174,716.08 and $34,099.25, the portion of the amount of the $75,000 received from the Dales allocated as selling price of the fixed assets. The petitioner allocated $31,012.93 of the $75,000 as being the selling price of the inventories, which had an adjusted basis of $158,891.39, and treated the difference of $127,-878.46 as a part of the cost of goods sold during 1953.

In the notice of deficiency the respondent disallowed, pursuant to section 24(b) of the Internal Revenue Code of 1939, the loss deduc-

tions claimed on account of the disposition to the Dales of the land and buildings and the fixed assets. He also disallowed the amount of $127,878.46 as a part of the cost of goods sold, and further determined that the deduction of such amount as a loss is precluded by section 24(b) of the Code.

### Management Services

On or about October 13, 1955, the Mount Vernon Co. of Mount Vernon, Ohio, acquired all of petitioner's outstanding capital stock. About July 1957 the Holly Corp. of New York acquired in excess of 50 percent of each class of the outstanding stock of the Mount Vernon Co.

At the time that the Mount Vernon Co. acquired all of the petitioner's outstanding capital stock, the petitioner's then officers continued as such. Included among them were Freund, Wilhartz, Isherwood, and Baird who had existing contracts for employment for the period April 1, 1953, to March 31, 1958.[8]

According to the petitoner's income tax returns for the taxable years 1956 and 1957 salaries were paid to officers as follows:

|  | 1956 | 1957 |
|---|---|---|
| Schulman, chairman of the board | $19,874.89 | $19,875.03 |
| Freund, president | 54,000.00 | 54,000.00 |
| Wilhartz, executive vice president | 42,000.00 | 42,000.00 |
| Isherwood, vice president | 25,000.00 | 25,000.00 |
| Baird, vice president | 11,582.09 | |
| Brouk, vice president | 12,271.46 | |
| Buczynski, treasurer | 19,835.56 | 19,234.20 |
| Schuster, secretary | 15,067.78 | 14,817.10 |
| Allison, assistant secretary | 11,604.48 | |
| Total | 211,236.26 | 174,926.33 |

Freund, Wilhartz, Isherwood, and Baird had conducted the business operated by the petitioner and similar businesses for a period far in excess of 25 years, and believed that they knew how to operate the business without advice. They did at times directly contract and pay for some outside technical or professional services when they deemed it necessary. In 1956 and 1957 there was expended by the petitioner for such professional services the respective amounts of $32,073.59 and $22,962.29.

After the Mount Vernon Co. acquired all the stock of the petitioner in October 1955, its officers made investigations into the operations

---

[8] Such contracts provided, for each successive 12-month period, base salaries of $12,000 for each of such officers plus additional compensation as follows: Freund—an amount equal to 2.8 percent of the petitioner's gross sales up to a maximum aggregate compensation of $54,000 per 12-month period; Wilhartz—an amount equal to 2 percent of the petitioner's gross sales up to a maximum aggregate compensation of $42,000 per 12-month period; Isherwood—an amount equal to 0.87 percent of the petitioner's gross sales up to a maximum aggregate compensation of $25,000 per 12-month period; and Baird—an amount determined by the quantity of precast slabs manufactured up to a maximum aggregate compensation of $20,300 per 12-month period.

and management of the petitioner, and required the petitioner to furnish it with monthly balance sheets and profit-and-loss statements for the purpose of making such suggestions as they might care to offer. However, in view of the fact that the petitioner's officers were experienced men, and since during the taxable year 1956 the petitioner was prosperous, the Mount Vernon Co. did not, to any large extent, interfere with the management of the petitioner during that year. The monthly financial reports which the petitioner submitted indicated a continuous shrinking of the petitioner's backlog of business, but the Mount Vernon Co., which knew little about the roof slab business, was not much concerned until the petitioner's sales began to decline during the taxable year 1957, when it gave more attention to the petitioner. On some occasions during 1956 and 1957 (the record not disclosing when or how often) the Mount Vernon Co. through its officers rendered some services (to an undisclosed extent) to the petitioner. On one occasion the Mount Vernon Co. assigned one of its employees to the petitioner, although it continued to pay his salary.

During 1956 and 1957 the principal activity of the Holly Corp. was the acquisition of new operations. Its executive officers were qualified in the fields of accounting, law, engineering, finance, and banking. Generally, but not always, its executive staff dominated the boards of directors of affiliated or subsidiary companies which it controlled, and it often replaced the management of such companies. The existence of the above-mentioned employment contracts of the officers of the petitioner, which had about 8 months to run at the time the Holly Corp. obtained control of the Mount Vernon Co., precluded any immediate change in the management of the petitioner. Both before and after the Holly Corp. obtained control of the Mount Vernon Co. in July 1957, the Holly Corp. strongly recommended to the petitioner's officers that the petitioner diversify its products and made suggestions with respect thereto, but the petitioner's management was unwilling to accept the suggestions. Accordingly, the Holly Corp. could not render much service to the petitioner. It did, however, render some service to the petitioner (the extent and frequency thereof not being shown by the record). On at least two occasions it sent one of its vice presidents to consult with the petitioner with respect to union contracts, on another occasion an officer of a subsidiary of Holly Corp. discussed with petitioner certain technical factors regarding prestressing concrete, and on other occasions the treasurer of the Holly Corp. and another financial employee rendered some services to the petitioner.

Whatever services were performed for the petitioner by the Mount Vernon Co. or the Holly Corp. were rendered at the instance of those companies, and not at the instance of the petitioner's management. The directors and stockholders of the petitioner regularly held meet-

ings, and minutes were kept of such meetings. No minutes purport to authorize petitioner to seek, request, accept, or pay for services from the Mount Vernon Co. or the Holly Corp. except as set forth in the minutes of meetings of the board of directors of petitioner held on October 16, 1956, and March 4, 1957.

At the October 1956 meeting of the petitioner's board of directors it was resolved that the corporation accrue a management fee payable to the Mount Vernon Co. in the amount of $20,000 for financial services and advice for the period January 1 to August 31, 1956.[9] The Mount Vernon Co. refused to accept the amount of $20,000 as being an adequate payment and made claim for payment based upon 3 percent of net sales of the petitioner. Thereupon, at a meeting of the petitioner's directors held on March 4, 1957, the matter was again considered and it was resolved that the petitioner accrue an annual service and management charge beginning January 1, 1956, predicated on 2 percent of net sales of the petitioner.[10]

[9] The minutes of the meeting of Oct. 16, 1956, provide in part as follows:

"The Chairman stated that the first order of business of the meeting related to a management fee which The Mount Vernon Company, the parent of this corporation, desires to recover from this corporation for services which it has rendered. A discussion of the matter followed and it was pointed out that The Mount Vernon Company, through its various officers, has rendered valuable service to this corporation in connection with financial matters and in connection therewith, certain of its officers have spent considerable time and effort since January 1, 1956.

"It was the consensus that a reasonable fee for such services, payable to The Mount Vernon Company, should be accrued by this corporation and it was agreed that a fee in the amount of $20,000 covering the period from January 1 to August 31, 1956, would be fair and reasonable. Upon motion duly made, seconded, and unanimously carried, the following resolution was adopted:

"RESOLVED, that this corporation accrue a management fee payable to The Mount Vernon Company in the amount of $20,000 for financial services and advice for the period January 1 to August 31, 1956."

[10] The minutes of the meeting of Mar. 4, 1957, provide in part as follows:

"The Chairman stated that the meeting had been called in order that a final determination of the proper allocation of administrative and other general corporate expenses paid and incurred by The Mount Vernon Company should be made to this corporation for such management and other services Mount Vernon has rendered this company. The directors reviewed the matter and attention was directed to the $20,000 accrued to The Mount Vernon Company as a management and service fee for financial services and advice for the period January 1 to August 31, 1956. Mr. Boodell stated that The Mount Vernon Company refused to accept this Board's determination of this amount as being a final allocation of administrative and other general corporate expenses, including fiscal, accounting, legal, financial and other expenses of The Mount Vernon Company. He stated that on or about October 3rd, agreements had been entered into by and between The Mount Vernon Company and Holly Corporation whereby the assets of Federal Cement Tile Company would be sold to Holly, and because of this the Mount Vernon Board had not made any issue of its claim for such services based on 3% of net sales. He stated that subsequently the agreements between Mount Vernon and Holly were modified and that the assets of Federal were not contracted to be sold to Holly Corporation or any of its subsidiaries, and as a result the dispute involving the proper allocation of such charges between the two companies would have to be finally determined. He stated that in his opinion Mount Vernon, through its various officers, had rendered valuable services to this corporation in connection with general corporate, fiscal, accounting, legal, financial and other matters and in connection therewith certain of its officers and employees had spent considerable time and effort since October 6, 1955 in promoting the interests of Federal Cement Tile Company. Mr. Wilhartz stated that this matter had been discussed from time to time and that a final resolution to the problem should be made so that the Company auditors could finish the audit.

"It was the consensus that to attempt each time an invoice was presented to make a proper distribution between Mount Vernon and Federal would be time consuming, cumber-

This amount was acceptable to the Mount Vernon Co. Accordingly, during the calendar year 1956, or within 2½ months thereafter, the petitioner paid to the Mount Vernon Co. the amount of $93,355.61, representing 2 percent of its net sales for that year, and during the calendar year 1957, or within 2½ months thereafter, it paid to the Mount Vernon Co. and the Holly Corp. a total of $62,341.98 ($47,-333.40 to the Mount Vernon Co. and $15,008.58 to the Holly Corp.), representing 2 percent of its net sales for that year.

The income tax returns of the Mount Vernon Co. for the taxable years 1956 and 1957 do not report the receipt of any dividends from the petitioner. In its return for the taxable year 1956 it reported taxable income (before net operating loss deduction and special deductions) of $135,788.55. However, it reported net operating loss carryovers totaling $1,146,625.14 and special deduction of $2,528.75, which more than offset its taxable income for the year. In its return for the taxable year 1957 it reported a net operating loss of $1,139,-800.05. The Holly Corp. in its return for its taxable year ended July 31, 1957, reported taxable income (before net operating loss deduction) of $272,512. However, it reported net operating loss carryovers of $1,098,396.21, which more than offset its taxable income for that year. In its return for the taxable year ended July 31, 1958, the Holly Corp. reported a net operating loss of $924,403.

In its income tax returns for the taxable years 1956 and 1957 the petitioner deducted under the heading "Other deductions" the respective amounts of $93,355.61 and $62,341.98 for "Management Services." In such returns the petitioner reported for those 2 years gross income in the respective amounts of $1,402,388.68 and $755,286.03. Therein it reported taxable income (before net operating loss carryover) of $397,639.61 for the taxable year 1956. It reported a net operating loss of $22,694.73 for the taxable year 1957.

In the notice of deficiency the respondent disallowed the amounts deducted for "Management Services" for the taxable years 1956 and 1957 with the explanation that the petitioner had failed to substantiate

some and costly. Mr. Boodell again stated that the Mount Vernon board was of the opinion that a distribution of costs between the companies should be based on 3% of Federal sales which in the opinion of the Mount Vernon board was fair and equitable. Mr. Boodell stated that he had reviewed the matter with the company auditors and that such an allocation in their opinion was fair and reasonable. Mr. Freund stated that the company had enjoyed a good year and suggested that a lesser percentage allocation be agreed upon. Upon consideration and discussion, a percentage based on 2% of net sales was determined to be fair and reasonable. Messrs. Schulman and Boodell stated they would recommend such charges to the Mount Vernon board. The following resolution was thereupon unanimously adopted:

"RESOLVED that this corporation accrue an annual service and management charge, beginning January 1, 1956, predicated on 2% of the net sales of the company (before deduction of sales, costs and specific administrative expenses incurred by this company) evidencing the proper allocation of administrative and other general corporate, fiscal, accounting, legal, financial and other expenses of The Mount Vernon Company incident to its ownership and operation of Federal Cement Tile Company."

that such amounts constituted allowable deductions under section 162 or any other section of the Internal Revenue Code of 1954.

The reasonable value of the services rendered to the petitioner by the Mount Vernon Co. in 1956 was $15,000. The reasonable value of the services rendered to the petitioner by the Mount Vernon Co. and the Holly Corp. in 1957 was $15,000.

OPINION

The first issue is whether the petitioner in computing taxable income from the operation of the business conducted by it in the taxable years 1953 through 1956 may deduct, pursuant to sections 23(s) and 122 of the Internal Revenue Code of 1939, and section 172 of the Internal Revenue Code of 1954,[11] net losses sustained in the operation of the business which it conducted in its taxable years 1950, 1951, and 1952.

The respondent's principal position is that the claimed deductions must be disallowed for the same reason that the net operating losses were disallowed as deductions in *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382, that is, because the business in which the net operating losses were sustained was not substantially the same business as that which gave rise to the income sought to be offset by the carryovers. He also contends that the claimed deductions must be disallowed because of the provisions of section 129(a) of the Internal Revenue Code of 1939 and section 269(a) of the Internal Revenue Code of 1954.[12]

---

[11] Sec. 23(s) of the 1939 Code provides for the deduction of the net operating loss deduction computed under sec. 122.

Sec. 122(b)(2)(B) of the 1939 Code provides in part:

(B) Loss for Taxable Year Beginning After 1949.—If for any taxable year beginning after December 31, 1949, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the five succeeding taxable years * * *

Sec. 172 of the Internal Revenue Code of 1954 provides in part:

(a) Deduction Allowed.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. * * *

    \*       \*       \*       \*       \*       \*       \*

(g) Special Transitional Rules.—

(1) Losses for Taxable Years Ending Before January 1, 1954.—For purposes of this section, the determination of the taxable years ending after December 31, 1953, to which a net operating loss for any taxable year ending before January 1, 1954, may be carried shall be made under the Internal Revenue Code of 1939.

It should be pointed out that sec. 381 of the 1954 Code contains special provisions for carryovers in certain corporate acquisitions, and that sec. 382 contains special limitations on net operating loss carryovers. However, it is clear that the transactions here involved occurred before the effective date of those sections. See secs. 392, 393, and 394, 1954 Code, and *Irving-Kolmar Corporation*, 35 T.C. 712. Neither party contends that the provisions of secs. 381 and 382 are here applicable.

[12] Sec. 129(a) of the Internal Revenue Code of 1939 provides in part:

If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For the purposes of clauses (1) and (2), control means the ownership of stock possessing at least 50 per centum of the total combined voting power of all classes of stock entitled to vote or at least 50 per centum of the total value of shares of all classes of stock of the corporation.

Sec. 269(a) of the Internal Revenue Code of 1954 contains substantially identical provisions.

In *Libson Shops, Inc.* v. *Koehler, supra,* the same interests owned 17 corporations, 16 of which were engaged in the retail clothing business and 1 of which was engaged in rendering management services to the others. Each of these 17 corporations filed separate income tax returns. The 16 sales corporations were merged into the managing corporation (the same interests continuing in control), and the surviving corporation conducted the entire business as a single enterprise. Prior to the merger three of the sales corporations had net operating losses, and the year following the merger each of the retail units formerly operated by these three corporations continued to sustain operating losses. In its income tax return for the first year after the merger the surviving corporation claimed deductions for the net operating losses of these three constituent corporations. The Supreme Court held that the claimed deductions were not allowable, stating in part:

The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year. There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business.

\* \* \* \* \* \* \*

The fact that § 129(a) is inapplicable does not mean that petitioner is automatically entitled to a carry-over. The availability of this privilege depends on the proper interpretation to be given to the carry-over provisions. We find nothing in those provisions which suggest that they should be construed to give a "windfall" to a taxpayer who happens to have merged with other corporations. The purpose of these provisions is not to give a merged taxpayer a tax advantage over others who have not merged. We conclude that petitioner is not entitled to a carry-over since the income against which the offset is claimed was not produced by substantially the same businesses which incurred the losses.

We agree with the respondent that the instant case is controlled by the decision in the *Libson* case.

Here, in 1953 the Schulman group owned an Illinois corporation, the name of which was Federal Cement Tile Co., which, together with its predecessors, had conducted a successful cement tile roofing business in the midwest area of the United States. The petitioner prior to 1953 had operated, under the name of Durisol, Inc., an unsuccessful cement tile roofing business in 15 States on or near the East Coast of the United States. The Schulman group in May 1953 acquired control of the petitioner, and simultaneously the petitioner transferred its plant and operating assets to the old stockholders,

retaining, however, the rights to use of the Durisol process except in the 15 East Coast States. Shortly thereafter Federal Cement Tile Co. was merged into the petitioner, the latter being the survivor and adopting the name "Federal Cement Tile Company." The petitioner ceased the operation of the business which it had conducted in the East Coast States, but continued, successfully, to operate the same business which had been conducted in the Midwest by the Illinois corporation and its predecessors. The petitioner seeks to apply against the income of the business enterprise conducted by it in the Midwest in the years in question, the net operating losses sustained in prior years by it in the business conducted by it in the East Coast States.

Clearly the business enterprise carried on by the petitioner in the years in question was not substantially the same business enterprise in which the net operating losses were sustained. Indeed, we consider them entirely separate enterprises. It is true that the petitioner did carry on in the years in question some business in the Midwest involving the Durisol process. However, the sales of the Durisol product represented only a relatively minor part of the total sales, and these were confined to the Midwest area, the petitioner having disposed of the right to use and exploit the Durisol process in the East Coast States.[13]

The fact that the petitioner, the continuing corporation, is the same corporation which sustained the operating losses in the prior years, does not serve to render inapplicable the rule of the *Libson* case. *J. G. Dudley Co.*, 36 T.C. 1122, affd. (C.A. 4) 298 F. 2d 750; *Huyler's*, 38 T.C. 773, on appeal (C.A. 7); and *Julius Garfinckel & Co.*, 40 T.C. 870, and cases cited therein.

Actually the *Libson* case was a stronger case for the taxpayer than the instant case. There the same interests which controlled all the corporations before the merger were in control of the surviving corporation. Here the group which owned the petitioner during the years in question had no interest whatever in the petitioner during the years the net losses were sustained. See *Norden-Ketay Corporation* v. *Commissioner*, (C.A. 2) 319 F. 2d 902, affirming a Memorandum Opinion of this Court; *Huyler's, supra;* and *Commissioner* v. *Virginia Metal Products*, (C.A. 3) 290 F. 2d 675, certiorari denied 368 U.S. 889, reversing 33 T.C. 788.

The question whether a business which sustains a net operating loss is substantially the same business which produces the income against which the net loss is claimed as an offset is to be determined upon the basis of the particular facts in each case. We have carefully examined the two cases principally relied upon by the petitioner, *Kolker*

---

[13] It may be added that there is no showing that the portion of the midwest business consisting of the sale of the Durisol product resulted in the production of any profit.

*Bros.*, 35 T.C. 299, and *Goodwyn Crockery Co.*, 37 T.C. 355, affd. (C.A. 6) 315 F. 2d 110, but find that they involved factual situations so different from that involved herein that they furnish no authority for the petitioner's position here. See *Julius Garfinckel & Co.*, *supra*, in which we distinguished the *Kolker* case.

As stated, the respondent also contends that the principal purpose for which the Schulman group acquired control of the petitioner was evasion or avoidance of tax by securing the benefit of a deduction which would not otherwise be enjoyed, and that for this reason the claimed deductions should be disallowed pursuant to section 129(a) of the 1939 Code and section 269(a) of the 1954 Code. We have found that one of the purposes for the acquisition of such control was to obtain such a deduction, but in view of our holding above with respect to the application of the doctrine of the *Libson Shops* case, we find it unnecessary to decide whether such was the principal purpose for the acquisition of control of the petitioner. If there is no continuity of business enterprise the deduction of a net operating loss is precluded, irrespective of whether section 129(a) of the 1939 Code or section 269(a) of the 1954 Code applies. *Libson Shops, Inc.* v. *Koehler, supra; Norden-Ketay* v. *Commissioner, supra;* and *Commissioner* v. *Virginia Metal Products, supra.*

We hold that the respondent did not err in disallowing the claimed net operating loss deductions.

The second issue presented is whether the petitioner is entitled to loss deductions for the year 1953 totaling $339,892.78 on account of its sale or exchange to the Dales in that year of its land and buildings at Beacon, N.Y., its fixed assets, and its inventories. The respondent determined that the deduction of any such losses is precluded by section 24(b) of the Internal Revenue Code of 1939.[14] In his amended answer the respondent alleged in the alternative that the deduction of such losses is precluded by section 129(a) of the Code, quoted *supra* in footnote 12.

The stipulated facts show that John D. Dale and Louise B. Dale, to whom the assets were transferred, owned more than 50 percent in value of the outstanding stock of the petitioner until May 13, 1953, the date on which they transferred their stock to the Schulman group.

---

[14] Sec. 24(b) provides in part as follows:

(1) LOSSES DISALLOWED.—In computing net income no deduction shall in any case be allowed in respect of losses from sales or exchanges of property, directly or indirectly—

\* \* \* \* \* \* \*

(B) Except in the case of distributions in liquidation, between an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

\* \* \* \* \* \* \*

(2) STOCK OWNERSHIP, FAMILY, AND PARTNERSHIP RULE.—For the purposes of determining, in applying paragraph (1), the ownership of stock—

\* \* \* \* \* \* \*

(B) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family.

The agreement for the sale of the stock by the Dales to the Schulmans was entered into on April 29, 1953. Therein it was recited that the petitioner and Louise B. Dale had agreed that petitioner would, prior to the closing date, convey the land and buildings at Beacon, N.Y., to Louise Dale in full satisfaction of the petitioner's indebtedness to her in the principal sum of $325,000, plus interest thereon. On the same date the Dales and the Schulmans entered into another agreement which provided that, simultaneously with the closing of the purchase of the petitioner's stock from the Dales, there would be transferred from the petitioner to the Dales, for a purchase price of $75,000, the petitioner's inventories and fixed assets.

In accordance with these agreements the petitioner on or about May 12, 1953, conveyed its land and building at Beacon, N.Y., to the Dales or their nominee in satisfaction of the petitioner's indebtedness to Louise B. Dale, and by bill of sale executed on May 13, 1953, by Schulman as president of the petitioner, the inventories and fixed assets (and certain intangible assets) were transferred to the Dales for $75,000.

The petitioner contends that section 24(b) is not here applicable. With respect to the inventories and fixed assets, it states that the transfer must have been made to the Dales after they had disposed of their stock interest in the petitioner, since the bill of sale was executed on May 13, 1953, by Schulman as the new president of the petitioner who represented the new stockholders. The petitioner concedes that the land and building at Beacon, N.Y., were transferred to the Dales on May 12, the day before the Dales transferred their stock to the Schulman group. However, it contends that because of the provisions of the stock purchase agreement of April 29, 1953, Schulman and his associates from that time should be considered the true "owners" of the petitioner's stock within the meaning of section 24(b), since they were assured of control of the petitioner.

From a reading of the two agreements of April 29, 1953, it is apparent that the transfer of the stock interest from the Dales to the Schulman group, and the transfer of the assets in question from the petitioner to the Dales, were parts of one plan, and that neither transfer was to occur without the other. Due to the fact that the Dales were to provide for the completion of the petitioner's existing unfilled contracts, and the fact that the petitioner was not to thereafter engage in carrying on business in the East Coast States, the substance of the transaction was the acquisition by the Schulman group of the petitioner devoid of the New York plant and the fixed assets and inventories; and there can be no question that in fixing the selling price of the stock there was taken into account the agreements with respect to the transfer of assets to the Dales.

Under such circumstances we think it must be considered that, within the contemplation of section 24(b) of the Code, the sales in question were made to the Dales while they owned more than 50 percent in value of the outstanding stock of the petitioner. It is immaterial whether the Dales transferred their stock to the Schulman group before, after, or simultaneously with the transfer of the assets to them. If, as contended by the petitioner, it should be considered that on April 29, 1953, the Schulman group had such rights in the stock as to amount to ownership thereof, then by the same token it would necessarily be considered that the Dales had such interest in the assets of the petitioner to be transferred as rendered them the substantial owners thereof on April 29, 1953, with the result that the sales were to stockholders owning more than 50 percent in value of the outstanding stock.

The instant case is somewhat similar to *W. A. Drake, Inc.* v. *Commissioner*, (C.A. 10) 145 F. 2d 365, affirming *W. A. Drake, Inc.*, 3 T.C. 33. There an individual who owned more than 50 percent in value of stock of a corporation contracted with the corporation for the purchase from it of a farm, the purchase price to consist of the assumption by the individual of an outstanding mortgage and the transfer to the corporation of a portion of the individual's stock in the corporation. The individual immediately transferred a portion of the stock to the corporation, and this left him owning less than 50 percent in value of the corporation's outstanding stock. About 3 months thereafter the deed to the farm was delivered to the individual after payment of the balance of the consideration. In holding that section 24(b) of the Internal Revenue Code of 1939 precluded the deduction by the corporation of a loss on the transaction, the Court stated in part:

The right to deduct this loss depends upon the nature of the transaction out of which it arose. It arose out of a transaction with an individual who owned, directly or indirectly, more than fifty-one per cent in value of the outstanding stock of petitioner.

It is immaterial whether title to the stock passed to the corporation before title to the land passed to Bartels, or vice versa, or whether title passed at the same time. The transaction out of which the loss occurred had its beginning with the contract of October 11, 1940, which we have held was a binding and enforceable contract from the date of its execution. This places the transaction squarely within the purview of the Act, and petitioner was not entitled to the claimed deduction.

The transactions out of which the losses occurred in the instant case had their beginning with the agreements of April 29, 1953, at which time there can be no question that the Dales owned more than 50 percent in value of the outstanding stock of the petitioner. Thus, we think it must be considered that here, as in the *Drake* case, the petitioner sold assets to stockholders owning more than 50 percent in value of its outstanding stock. The fact that here, as in the *Drake*

case, the stockholders simultaneously relinquished their control does not permit a conclusion that section 24(b) is inapplicable. As we said in the *Drake* case:

Nor is it important that as a result of the transaction Bartel's stock ownership became less than 50 percent. The statute makes no such exception, nor can we.

The petitioner points out that the contract whereby the Dales agreed to purchase the assets in question from the petitioner was not made with the petitioner, but with the Schulman group and it claims that this was an arm's-length transaction, whereas in the *Drake* case the contract was between the controlling shareholder and his controlled corporation. We think, however, that the fact that the petitioner was not a party to the agreements does not alter the result. Since the agreements were between the then controlling stockholders and the prospective controlling stockholders, there could be no question of compliance by the petitioner; and it did comply. In addition, it may be pointed out that the stock purchase agreement recites that the petitioner had agreed with the Dales to transfer the land and building at Beacon, N.Y., to the Dales. The applicability of section 24(b) is not dependent upon whether the transaction was bona fide or at arm's length. As stated by the Supreme Court in *McWilliams* v. *Commissioner*, 331 U.S. 694, section 24(b) "states an absolute prohibition— not a presumption—against the allowance of losses on any sales between the members of certain designated groups." And in the *Drake* case we reviewed the legislative history of section 24(b) and concluded that Congress did not see fit to make any exception even though the sale and the loss may both have been bona fide.

The petitioner contends that since in *Prentiss D. Moore*, 17 T.C. 1030, affd. (C.A. 5) 202 F. 2d 45, we took the position that the taxpayer, by virtue of a contract for the acquisition of stock of a corporation, was assured of control of such corporation (and therefore "owned" more than 50 percent in value of its stock) and that he therefore could not deduct a loss upon the transfer by him of property to the corporation, we should here hold that by virtue of the agreement of April 29, 1953, the Schulmans, and not the Dales, should be considered as the owners of more than 50 percent in value of the petitioner's stock at the time of the transfers of the property by the petitioner to the Dales. We cannot agree. As pointed out hereinabove, if it should be considered in the instant case that the Schulman group on April 29, 1953, acquired "ownership" of stock of the petitioner, it would necessarily be considered that the Dales on the same date acquired such rights in the assets to be transferred as to constitute them the owners thereof, since obviously the transfer of the stock and the transfer of the assets were integral parts of one transaction. In the *Moore* case both we and the Court of Appeals made it clear that there was no inconsistency between the holding there and the holding in the *Drake*

case. Likewise, there is no inconsistency between the holding herein and the holding in the *Moore* case.

We hold that the claimed loss deductions are precluded by section 24(b) of the Code. In view of this conclusion it is unnecessary to decide whether the principal purpose of the acquisition of control of the petitioner by the Schulman group was to obtain the benefit of these loss deductions and hence whether section 129(a) of the Code precludes the deduction of such losses.

The last issue for decision is whether the petitioner is entitled to any deduction under section 162(a) of the Internal Revenue Code of 1954 [15] on account of the payment of $93,355.61 which it made to its parent, the Mount Vernon Co., in the taxable year 1956, and on account of the payment of $62,341.98 which it made to its parent and the parent's controlling stockholder, the Holly Corp., in the taxable year 1957.

The respondent disallowed the full amounts claimed and contends that the petitioner has not met its burden of showing that any portion of such amounts constituted ordinary and necessary business expenses of the petitioner. He relies heavily upon *Heil Beauty Supplies* v. *Commissioner*, (C.A. 8) 199 F. 2d 193, affirming a Memorandum Opinion of this Court, wherein it was held that an amount paid by a corporate taxpayer to its majority stockholder for services claimed to have been rendered had not been shown to be ordinary and necessary expenses of the corporation.

That case, as well as numerous other cases, including *Ingle Coal Corporation* v. *Commissioner*, (C.A. 7) 174 F. 2d 569, affirming 10 T.C. 1199, and *Darco Realty Corporation* v. *Commissioner*, (C.A. 2) 301 F. 2d 190, affirming a Memorandum Opinion of this Court, holds that an arrangement between a corporation and its controlling stockholders is subject to close scrutiny to determine whether that which is claimed as compensation for services is in reality a distribution of profits, and that the question is essentially one of fact.

The respondent points out that any services which may have been rendered were not rendered at the request of the petitioner, and therefore contends that such services were forced upon the petitioner by the other corporations, that the petitioner was under no liability to pay therefor, and that, therefore, no amount paid can be considered as an ordinary and necessary expense of the petitioner. While the record here presented is far from satisfactory in many respects, it does establish, we think, and we have found as a fact, that some services

---

[15] Sec. 162(a) of the Code provides in part as follows:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

were rendered to the petitioner by the Mount Vernon Co. in 1956 and 1957. The executive vice president of the petitioner and a vice president of the Mount Vernon Co. so testified. Also, the directors of the petitioner, as shown by the minutes of their meetings, recognized that services had been rendered to the petitioner in connection with accounting, legal, financial, and other matters, and recognized a liability to reimburse the Mount Vernon Co. for the portion of Mount Vernon's costs properly allocable to such services. The evidence also shows that some services were rendered by the Holly Corp. to the petitioner in 1957. Both the executive vice president of the petitioner and the president of the Holly Corp. so testified.

The difficulty here is that the petitioner has not shown any details as to the character and extent of the services rendered. Nor has it furnished any evidence upon which the value of such services can be determined with exactitude. Under the circumstances, a serious question is presented as to whether the petitioner has shown that any amount should be allowed (*Heil Beauty Supplies* v. *Commissioner*, *supra*). However, as noted in the *Heil* case, the question of whether a deduction should be allowed and the amount thereof depends upon the evidentiary situation obtaining in each case.

Here, none of the above-mentioned officers of the petitioner and of the other corporations testified as to the value of the services, and on this question the evidence we have consists almost entirely of the minutes of the meetings of the petitioner's directors. In view of the fact that the Mount Vernon Co. owned all the stock of the petitioner, we cannot view the action of the board of directors of the petitioner taken on March 4, 1957, as representing an independent judgment of such directors as to the value of the services. We do not know the composition of the board of directors of the petitioner (except that Schulman was the chairman), and therefore whether such board was dominated by officers or directors of the Mount Vernon Co. (or later by the officers and directors of the Mount Vernon Co. and the Holly Corp.). There is no showing that there was any connection whatever between the value of the services rendered and 2 percent of net sales of the petitioner.[16]

The amount of $20,000 fixed by the board of directors of the petitioner on October 16, 1956, as representing a proper amount as compensation for the first 8 months of 1956, would seem to more nearly represent an independent judgment of the directors, and we think their action in fixing this amount is entitled to some weight, although it is not conclusive since we cannot conclude that such action was not influenced, to some extent, by the fact that it was the petitioner's parent which was requesting the compensation.

---

[16] As pointed out in *Heil Beauty Supplies* v. *Commissioner*, (C.A. 8) 199 F. 2d 193, this might indicate that the payment was at least in part, a distribution to the stockholder.

Believing, as we do, that some services were rendered to the petitioner by the other two corporations, we feel it incumbent upon us to exercise our best judgment and allow as a deduction for each year some amount as representing a reasonable allowance for compensation for such services. In the exercise of our best judgment, and bearing heavily against the petitioner who has the burden of proof and whose inexactitude is of its own making, we have found as a fact that the reasonable value of the services rendered to the petitioner by the Mount Vernon Co. in 1956 was $15,000, and by the Mount Vernon Co. and the Holly Corp., combined, in 1957 was $15,000. *Cohan* v. *Commissioner*, (C.A. 2) 39 F. 2d 540. Those amounts will be allowed as deductions in the recomputation under Rule 50.

*Decisions will be entered under Rule 50.*