GOODWYN CROCKERY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 86194. Filed November 29, 1961.

*Ernest Woodward II, Esq.*, for the petitioner.
*S. Earl Heilman, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioner's income tax for the fiscal years ended June 30, 1956, 1957, and 1958, of $4,122.63, $35,748.26, and $24,803.67, respectively, and an addition to tax for 1956 under section 6651 of the Internal Revenue Code of 1954[1] of $1,030.65.

Petitioner had net operating losses in years prior to 1956. In 1956 petitioner's capital stock was sold to another corporation. The questions for decision are whether petitioner is entitled to deduct operating loss carryovers in the years 1956, 1957, and 1958; whether an

---

[1] All section references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise noted,

amount paid for a management survey in 1955 should have been deducted in 1955 or whether it is amortizable and deductible during the years in question; and whether petitioner is liable for an addition to tax for failure to file its 1956 return on time.

## FINDINGS OF FACT.

Some of the facts have been stipulated and they are found accordingly.

Petitioner Goodwyn Crockery Company is a corporation organized under the laws of Tennessee. As will appear, it is a wholly owned subsidiary of J. L. Turner & Son, a corporation. Until March 1956 petitioner's principal place of business was Memphis, Tennessee. It filed Federal income tax returns for its fiscal years ended June 30, 1956, 1957, and 1958, with the district director of internal revenue at Nashville, Tennessee.

Petitioner was organized in 1921 and successfully engaged in the wholesale housewares business in Memphis for many years. Prior to January 1956 the corporation was a wholesaler of durable household goods such as glassware, dishes, aluminumware, kitchen utensils, tableware, small electrical appliances, and similar items. Its sole wholesale outlet was in Memphis. It employed about 15 persons, including about 5 salesmen. Its business equipment, in general, consisted of a delivery truck for local deliveries in Memphis, a bookkeeping machine and other office equipment, furniture, files, typewriters, and a building which included office and showroom space as well as a warehouse area. In general, the territory served by the corporation covered parts of Illinois, Missouri, Tennessee, Arkansas, and Kentucky. Within about 150 miles of the Memphis area it had several hundred independent small businessmen as its customers.

Petitioner's former owner died in about 1948 and the business was left to his widow who was then its principal shareholder. Although elderly, the widow attempted to run the business utilizing long-time employees who were also advanced in years. Under her management petitioner lost money steadily for 5 or 6 years and by about 1955 the firm was in poor financial condition. In about 1955 the widow engaged a firm to conduct a study of petitioner's operations and to recommend steps to be taken to return petitioner to a profitable position. The study was made and during its fiscal year ended June 30, 1955, petitioner paid $38,899.01 for the management survey and report. Among other things, the report recommended the hiring of a manager and, as a result, C. P. Smallwood was hired to manage the business.

At about this time petitioner's inventory was becoming depleted and its creditors, primarily suppliers of items it carried in inventory, were becoming restive. Smallwood contacted the creditors and ar-

ranged for a settlement with them whereby they would forgive a substantial portion of petitioner's debts. As a part of his discussions with the inventory suppliers, Smallwood indicated that if petitioner again became profitable it would continue to purchase from the suppliers in the future. He then attempted to find outside financial support so the business could continue.

J. L. Turner & Son is a corporation engaged in the wholesale dry goods business and has its principal place of business in Scottsville, Kentucky. Cal Turner is its president, and he and his father own all of its stock. Turner & Son owns all of the stock of several other corporations engaged in the retail of general merchandise, and its operation of its own business and that of its subsidiaries has been consistently profitable for a number of years. Until January 1956 the Turner businesses had dealt only with dry goods, as compared to housewares.

Cal Turner learned that petitioner was for sale. He checked petitioner's building and inventory and in January 1956, as agent for Turner & Son, he purchased all of petitioner's shares for about $65,000 and continued the operation of its business in Memphis with Smallwood in charge as manager.

After purchasing the stock in Goodwyn the Turners learned that a wholesale dry goods and wearing apparel business in Cairo, Illinois, was for sale. In about February 1956 Cal Turner went to Cairo and made a deal whereby he had petitioner buy the stock of merchandise of this business, the Weber Dry Goods Company, for about $0.60 on the dollar. As a part of the deal the Webers insisted the purchaser lease their building in Cairo for 2 years.

Petitioner's and Weber's sales territories were practically the same. After the purchase of the Weber stock of merchandise, the Turners concluded that Cairo would make a better distribution center for both petitioner's housewares and Weber's dry goods because competition in the Cairo area was less keen than in Memphis. They also believed that operating expenses could be curtailed by maintaining a single warehouse instead of two, and by using petitioner's salesmen to sell both petitioner's and Weber's stocks. Smallwood agreed to manage both businesses and in March 1956 petitioner's operations were moved from Memphis to Cairo.

Petitioner operated in Cairo under Smallwood's management until about December 1956. It continued to maintain an inventory of housewares substantially the same as it had in Memphis. Some types of merchandise such as window shades and oilcloth had been carried by both petitioner and Weber. Some of the Weber stock was merchandise of a type which had not been sold by petitioner out of Memphis. In general, the type of product sold by petitioner in Memphis and by Weber in Cairo were different.

Although the center of the territory in which petitioner's salesmen operated moved somewhat northward, in general the territory served by them while petitioner operated out of Cairo remained unchanged. Some of the customers to whom petitioner had sold in Memphis were also customers of Weber, including a substantial number in northeast Arkansas and the lower end of Missouri. After the move, many of petitioner's customers in the Memphis area were lost because freight charges made it difficult to match prices offered by Memphis competitors. However, it gained customers from those who had dealt with Weber and from new customers in the Cairo area. In general, the number and type of customers served from Cairo remained the same as it had been in Memphis, although individual customers were substantially different from those it had when it operated in Memphis. About 40 percent of petitioner's individual customers continued to trade with it after the move.

While petitioner operated in Cairo, in addition to Smallwood, several of its employees from Memphis, including some of the salesmen, continued to work for it, at least for a time. Smallwood had offered petitioner's salesmen the opportunity to handle both petitioner's and Weber's lines of merchandise and cover the same territory they were in. Smallwood made some adjustments in the various items offered for sale from Cairo. Unprofitable lines were discontinued, others were added. Some of the same suppliers who provided items of petitioner's inventory when it operated in Memphis continued to supply it in Cairo and do so to the present time. Petitioner continued to purchase from suppliers who had forgiven portions of its debts in 1955 and eventually dealt with them in much larger volume than before.

In June 1956 petitioner started operation of retail dollar general stores. These stores sold a variety of items, most of which were dry goods, with no item priced at more than $1. They were related companies which either operated as branches of petitioner or as subsidiary corporations.

Petitioner's operations in Cairo were not satisfactory to the Turners. In January 1957 petitioner moved its business from Cairo to Scottsville, Kentucky, the location of Turner & Son. The move was made so that Cal Turner could have immediate supervision of petitioner's operations and to effect a savings by having the business conducted in a smaller town, the site of the Turners' other business operations. Petitioner continued to pay rent under the Weber lease. Since January 1957 petitioner has conducted its wholesale business from Scottsville.

A few months after moving to Scottsville petitioner opened a retail store in its Memphis building. In its wholesale operation in Scottsville it utilized the basement of its retail store in Memphis as

a warehouse and transshipment point for merchandise originating to the south of Memphis. About six persons worked for petitioner in Scottsville after the move. In addition to Smallwood, one other person who had worked in Cairo was also employed by it in Scottsville. Immediately after the move to Scottsville, most of petitioner's sales were to subsidiaries of Turner & Son. Later, petitioner's business developed until about 40 percent of its sales were to customers outside the Turner & Son organization. When petitioner moved to Scottsville the bulk of its business was in dry goods. Afterwards it began to increase the proportion of its sales of durable goods. At the time of trial petitioner's volume of sales of housewares from its Scottsville location was in excess of $2 million a year.

The office equipment and delivery truck which petitioner had in Memphis were used in its operations in Cairo and Scottsville.

In the first several years after purchasing petitioner, Turner & Son put about $150,000 in cash into the business (including about $60,000 which was spent for the Weber merchandise).

Petitioner's sales for the period July 1, 1955, to July 30, 1955, were stipulated to be as follows:

| | |
|---|---:|
| Hardware and tools | $219. 06 |
| Household goods | 4, 057. 87 |
| Watches and toys | 78. 60 |
| Furniture and electrical equipment | 1, 076. 25 |
| Total | 5, 431. 24 |

The parties stipulated that sales for two of petitioner's salesmen over a 3-month period, March, April, and May 1956, are representative for the years in question. The records for those months show total sales, sales of dry goods, and sales other than dry goods, i.e., merchandise of the type sold by petitioner prior to January 1956, to be as follows:

| | *Salesman I* | *Salesman II* |
|---|---:|---:|
| Total sales | $9, 101. 95 | $10, 773. 25 |
| Sales of dry goods | 8, 861. 46 | 10, 528. 44 |
| Sales other than dry goods | 240. 49 | 244. 81 |

The parties have stipulated that sales made to three dollar stores were representative of all sales by petitioner.[2] Such sales are as follows:

Sales made to the Springfield, Kentucky, Dollar General Store—

| June 30, 1956, to Dec. 31, 1956: | |
|---|---:|
| Total sales | $107, 525. 05 |
| Sales of dry goods | 98, 765. 09 |
| Sales other than dry goods | 8, 759. 96 |

[2] The stipulation does not specify the period for which such sales are to be considered representative. We assume they are representative of petitioner's sales during the periods indicated in the stipulated schedule.

Sales made to the Springfield, Tennessee, Dollar General Store—

June 30, 1956, to Dec. 31, 1956:

| | |
|---|---|
| Total sales | $108,774.73 |
| Sales of dry goods | 97,502.48 |
| Sales other than dry goods | 11,272.25 |

Sales made to the Memphis, Tennessee, Dollar General Store—

September and October 1957:

| | |
|---|---|
| Total sales | $327,637.24 |
| Sales of dry goods | 304,706.34 |
| Sales other than dry goods | 22,930.90 |

The following stipulated schedule shows petitioner's wholesale sales, retail sales, and total sales for the years 1955 through 1958:

| Fiscal year ended June 30— | Wholesale sales | Retail sales | Total sales |
|---|---|---|---|
| 1955 | $376,721.97 | | $376,721.97 |
| 1956 | 300,684.36 | | 300,684.36 |
| 1957 | 2,298,515.43 | $461,932.93 | 2,760,448.41 |
| 1958 | 4,213,951.56 | 1,095,270.22 | 5,309,221.78 |

The parties have stipulated that a representative sampling of petitioner's invoices discloses the following percentages of items retailing for $1 and under, and $1 and over for the years 1955 through 1958:

| Fiscal year ended June 30— | Percent of items retailing for $1 and under | Percent of items retailing for $1 and over |
|---|---|---|
| 1955 | 42.42 | 57.88 |
| 1956 | 40.85 | 59.15 |
| 1957 | 100 | |
| 1958 | 97.37 | 2.63 |

On its tax returns for the years 1951 through 1955 petitioner reported net operating loss carryovers in the amounts of $15,194.27, $11,904.32, $24,697.63, $27,349.31, and $50,693.21, respectively. It is stipulated net operating loss deductions were claimed on its 1956, 1957, and 1958 income tax returns in the amounts of $7,566.10, $79,-323.57, and $41,520.90, respectively. Respondent disallowed these deductions in his notice of deficiency, explaining that petitioner was not entitled to the deductions "under the provisions of Section 382 or any other section of the Internal Revenue Code of 1954."

On its books petitioner recorded the $38,899.01 paid for the management survey in 1955 as a reorganization expense in the nature of a capital expenditure. It wrote off $6,460 of this amount in the first year and thereafter amortized it at the rate of $6,200 per year. At the end of its 1958 fiscal year the account showed a balance of

$13,839.01. Petitioner deducted $6,200 in each of the years in question and respondent disallowed the deduction because it was "not allowable within * * * section 161, or any other section."

Petitioner's corporate income tax return for its fiscal year ended June 30, 1956, was due to be filed on or before September 15, 1956. It was filed on April 4, 1957.

After the change in its stock ownership petitioner continued to carry on a business substantially the same as that conducted before the change in stock ownership.

Petitioner was not acquired by Turner & Son for the principal purpose of evading or avoiding income tax.

OPINION.

Section 382(a)[3] provides for the elimination of loss carryovers in the case of certain changes in a corporation's stockownership, coupled with a change in its business.

---

[3] SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS.
  (a) PURCHASE OF A CORPORATION AND CHANGE IN ITS TRADE OR BUSINESS.—
    (1) IN GENERAL.—If, at the end of a taxable year of a corporation—
      (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—
        (i) the beginning of such taxable year, or
        (ii) the beginning of the prior taxable year,
      (B) the increase in percentage points at the end of such taxable year is attributable to—
        (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or
        (ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and
      (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,
    the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.
    (2) DESCRIPTION OF PERSON OR PERSONS.—The person or persons referred to in paragraph (1) shall be the 10 persons (or such lesser number as there are persons owning the outstanding stock at the end of such taxable year) who own the greatest percentage of the fair market value of such stock at the end of such taxable year; except that, if any other person owns the same percentage of such stock at such time as is owned by one of the 10 persons, such person shall also be included. If any of the persons are so related that such stock owned by one is attributed to the other under the rules specified in paragraph (3), such persons shall be considered as only one person solely for the purpose of selecting the 10 persons (more or less) who own the greatest percentage of the fair market value of such outstanding stock.
    (3) ATTRIBUTION OF OWNERSHIP.—Section 318 (relating to constructive ownership of stock) shall apply in determining the ownership of stock, except that section 318(a)(2)(C) shall be applied without regard to the 50 percent limitation contained therein.
    (4) DEFINITION OF PURCHASE.—For purposes of this subsection, the term "purchase" means the acquisition of stock, the basis of which is determined solely by reference to its cost to the holder thereof, in a transaction from a person or persons other than the person or persons the ownership of whose stock would be attributed to the holder by application of paragraph (3).

The legislative history [4] of section 382 shows that its purpose was to complement section 269 where the use of loss carryovers are prohibited when the "principal purpose" for the acquisition of the stock of the loss corporation was to secure the benefit of a deduction which would not otherwise have been enjoyed. Under section 382(a) the prohibition against the use of the loss carryovers is not dependent upon purpose or intent.

Petitioner admits that the qualifying circumstances of change in stock ownership occurred. The only issue here is under section 382(a)(1)(C): whether petitioner "continued to carry on a trade or business substantially the same as that conducted before" Turner & Son bought its stock in January 1956.

At the outset it is to be noted that the operation of section 382(a)(1)(C) turns upon a finding of absence or presence of substantial sameness of the trade or business. Under the wording of the section it would seem there could be some changes in the manner of conducting that trade or business and yet the business could remain "substantially the same."

We have made a finding that the business here was substantially the same business as that conducted before the change in stock ownership. There were, of course, many changes when the Turner interests took charge but the basic character of the business of Goodwyn Crockery remained unchanged. It did business under the same name in the same area as a seller of general merchandise to the same type of customers.

There were changes in the inventory of merchandise it sold though at all times it continued to carry a stock of merchandise of what is called "hard goods." True, after the change in ownership, its inven-

[4] S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 53 and 285 (1954), states in part as follows: *B. Special Limitation on Net Operating Loss Carryover (sec. 382) (1) House changes accepted by committee*

Under present law where a controlling interest in a corporation is acquired for the purpose of avoiding or evading tax liabilities the Internal Revenue Service may disallow the benefits of a deduction, credit, or allowance which would otherwise be enjoyed by the acquiring person or corporation. This provision has proved ineffectual, however, because of the necessity of proving that tax avoidance was the primary purpose of the transaction. It has also been so uncertain in its effects as to place a premium on litigation and a damper on valid business transactions. [p. 53]

\* \* \* \* \* \* \*

*Section 382. Special limitations on net operating loss carryovers*

\* \* \* \* \* \* \*

It provides that if the corporation has not continued to carry on a trade or business substantially the same as that conducted immediately before any change in the percentage ownership of the fair market value of the stock, the condition in subparagraph (C) is met. The change in percentage ownership refers to an increase which would be counted under subparagraphs (A) and (B) in determining whether the 50 percentage point increase has been reached. If, as a result of such an increase, the corporation shifts from one type of business to another, discontinues any except a minor portion of its business, changes its location, or otherwise fails to carry on substantially the same trade or business as was conducted before such an increase, then the condition in subparagraph (C) is met. [p. 285]

tory of dry goods dominated its sales for a time. This was because when Turner & Son purchased the stock, its hard goods inventory was depleted and shortly thereafter it was able to buy an entire inventory of dry goods at a low price. Its business as a merchandiser of hard goods never changed and within a year or two after the stock sale it was selling more hard goods in the same business area than it had ever sold before. The inventory change was no more than the addition of a dry goods inventory. It denotes no shift from one *business* to another *business*.

It is also true there were changes in the location of petitioner's wholesale outlet after the stock sale. But the changes were not changes in the location of petitioner's business. Petitioner's business location was an area consisting of portions of four or five States. Moving its office to different locations in the same area is of scant significance in this case on the issue of whether it was continuing the same business. All of the evidence firmly establishes its salesmen covered the same territory before and after the change in stock ownership. By moving its wholesale outlet to different locations it gained and lost customers by reason of differential in transportation charges from warehouse to customer. This was trial and error conduct of the same business in the same territory in an attempt to find a pattern of operation which would make petitioner profitable. The Cairo move proved to be error. The Scottsville move proved to be right. Such change in location would be no more significant than a retail store moving across the street in the business section of a city. It is also significant here that the Memphis location was not actually abandoned. It was apparently vacated for a period of about a year, after which it was again used for petitioner's merchandising activities.

Respondent argues there was a change in petitioner's business when it began its retailing activities in June of 1956. We view this as an expansion from a wholesale seller of merchandise to an integrated wholesale-retail organization. It was merely taking on a different manner of selling its merchandise and not changing its business of selling the same merchandise in the same area.

Taking into consideration all of the facts and circumstances related in some detail in our Findings of Fact, we are convinced petitioner continued to carry on after the stock ownership change, substantially the same business it had conducted before such change. Therefore, section 382 does not limit petitioner's use of its net operating loss carryovers.

Respondent argues in the alternative that the net operating loss carryovers are prohibited by section 269 because "the principal purpose" for the acquisition of petitioner's stock by Turner & Son was

"evasion or avoidance of Federal income tax by securing the benefit of a deduction" which would not otherwise have been enjoyed.

We feel the evidence in this case affirmatively establishes the stock of petitioner was acquired by Turner & Son for a bona fide business purpose. Turner testified that while he knew of the loss carryovers, he would have bought the stock if it had not had a loss carry-forward: "Because it was a good value and we knew it was well worth the money, and an organization that had been losing money all these years had to get back into a profit column before the tax carry-over would be worth anything to us."

Turner testified the purchase was made because Turner & Son's wholesale experience had largely been in the dry goods business and petitioner's "type of operation of housewares" could have a place in their organization and be made profitable. He said the tax consequences were never discussed.

Turner & Son and its subsidiaries were successful dry goods companies. Turner said that when the stock of petitioner was purchased he knew they were buying a weak corporation which would need more capital and whose earning power would have to be developed. He said: "It was a struggle and we didn't throw any corporations that belonged to J. L. Turner & Son into Goodwyn Crockery to take any advantage of tax loss. We built our own company from Goodwyn Crockery and made it a continuing business like it is today." We hold the stock of petitioner was not acquired with the principal purpose of tax avoidance within the provisions of section 269. See *Baton Rouge Supply Co.*, 36 T.C. 1.

Sometime in 1955 a management survey of petitioner's business was conducted at a cost of $38,899.01. The resulting report suggested the employment of a manager, recommended changes in the Memphis plant and office layout, recommended changes in sales procedures, housekeeping, stock maintenance, inventory control, personnel reorganization, and general operating procedure. Smallwood, petitioner's manager, followed some of the recommendations of the report in subsequent years in petitioner's business operations. Petitioner argues that the amount should be amortized and deducted over 6 years. Respondent contends it is a business expense deductible in full in the year incurred. We hold for respondent on the issue. *Schlosser Bros., Inc.*, 2 B.T.A. 137. The expenditure is not unlike the expenditure for a survey to be used in connection with future financing which in *Herbert Shainberg*, 33 T.C. 241, we held to be an ordinary and necessary business expense and not a capital expenditure.

The parties have stipulated that petitioner's 1956 income tax return was not timely filed. Petitioner has not shown that the late filing was due to reasonable cause and not willful neglect. Section 6651 pro-

vides for an addition to tax of up to 25 percent of "the amount required to be shown as tax on such return." Because the net operating loss carryover results in no tax in 1956, there can be no addition to tax.

Because of adjustments not in issue, a Rule 50 computation will be necessary.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

TIETJENS, *J.*, dissenting: I would conclude that when all of the changes outlined in the findings of fact are considered in the aggregate, rather than separately, the petitioner did not continue "to carry on a trade or business substantially the same as that conducted before" within the meaning of section 382(a)(1)(C).

OPPER, *J.*, agrees with this dissent.