EUCLID-TENNESSEE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91228. Filed March 6, 1964.

---

*William Waller* and *Robert G. McCullough*, for the petitioner.
*James D. Burroughs*, for the respondent.

**OPINION**

The threshold controversy in this case centers around the narrow question of whether the petitioner "continued to carry on a trade or business substantially the same as that conducted before" its stock

was purchased by Trippeer. The applicable provision of the law is section 382(a),[1] I.R.C. 1954, which imposes special limitations on the use of net operating loss carryovers following certain changes in stock ownership resulting from stock purchase.

There is no dispute about the existence of the requisite percentage change in stock ownership or that a "purchase" of the petitioner's stock was made by the "persons" described in section 382(a)(2). The only limitation which is in dispute is that imposed by section 382(a)(1)(C).[2]

Petitioner contends that it was engaged exclusively in the "business" of owning and leasing real estate for 2½ years after the termination

---

[1] SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS.

  (a) PURCHASE OF A CORPORATION AND CHANGE IN ITS TRADE OR BUSINESS.—

    (1) IN GENERAL.—If, at the end of a taxable year of a corporation—

      (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at—

        (i) the beginning of such taxable year, or

        (ii) the beginning of the prior taxable year,

      (B) the increase in percentage points at the end of such taxable year is attributable to—

        (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or

        (ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and

      (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock,

the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.

    (2) DESCRIPTION OF PERSON OR PERSONS.—The person or persons referred to in paragraph (1) shall be the 10 persons (or such lesser number as there are persons owning the outstanding stock at the end of such taxable year) who own the greatest percentage of the fair market value of such stock at the end of such taxable year; except that, if any other person owns the same percentage of such stock at such time as is owned by one of the 10 persons, such person shall also be included. If any of the persons are so related that such stock owned by one is attributed to the other under the rules specified in paragraph (3), such persons shall be considered as only one person solely for the purpose of selecting the 10 persons (more or less) who own the greatest percentage of the fair market value of such outstanding stock.

    (3) ATTRIBUTION OF OWNERSHIP.—Section 318 (relating to constructive ownership of stock) shall apply in determining the ownership of stock, except that section 318(a)(2)(C) shall be applied without regard to the 50 percent limitation contained therein.

    (4) DEFINITION OF PURCHASE.—For purposes of this subsection, the term "purchase" means the acquisition of stock, the basis of which is determined solely by reference to its cost to the holder thereof, in a transaction from a person or persons other than the person or persons the ownership of whose stock would be attributed to the holder by application of paragraph (3).

[2] Respondent states in his reply brief that he is not relying here on the doctrine of *Libson Shops, Inc., v. Koehler*, 353 U.S. 382 (1957). This is in accord with the position asserted by the petitioner in its original brief. Cf. *Arthur T. Beckett*, 41 T.C. 386 (1963), where we said at page 416 that "it might be that where the change in ownership provision of sec. 382(a)(1)(C) applied, the principle of the *Libson Shops, Inc.,* case would be inapplicable since the statute now specifically provides the extent to which the net operating loss shall be disallowed under such circumstances."

of its brewery operations on July 1, 1954. The petitioner admits that after the change in its stock ownership it also engaged in the business of selling and servicing construction equipment, but asserts that adding "an additional line of business does not mean that it failed to continue to carry on a trade or business substantially the same as that conducted before the change in ownership." To support its contention the petitioner cites our decision in *Goodwyn Crockery Co.*, 37 T.C. 355 (1961), affd. 315 F. 2d 110 (C.A. 6, 1963). Taking the contrary view, respondent argues that the "business" of the loss corporation was "substantially changed" and that the general intent of Congress in enacting section 382 was to prohibit the use of loss carryovers to offset profits of a business unrelated to that which caused the loss.

We agree with petitioner that adding a new business does not necessarily trigger the change-of-business test so long as the "prior business" is continued.[3] But just what was the prior business of Gerst? Was it the manufacture and distribution of beer? Or was it merely the temporary rental of its industrial buildings following the abandonment of its brewery operations? In our opinion the correct answer—and certainly the realistic one under these facts and circumstances—is that the "prior business" was the manufacture and distribution of beer and not the leasing of its real property.

Both the regulations[4] and the Senate Committee report[5] clearly

---

[3] Sec. 1.382(a)–1(h)(8) [Income Tax Regs.] If, after an increase in ownership, the corporation continues to carry on its prior business activities substantially undiminished, the addition by the corporation of a new trade or business does not constitute a failure to carry on substantially the same trade or business. This subparagraph may be illustrated by the following example:

*Example.* X Corporation, a calendar-year taxpayer, is engaged in the manufacture and sale of electrical appliances and has sustained substantial net operating losses. On June 30, 1958, Y Corporation purchases 100 percent of X Corporation's outstanding stock. During 1959, X Corporation continues substantially undiminished its activities in the manufacture and sale of electrical appliances and also diversifies its activities by acquiring a cement manufacturing plant. The addition of the cement manufacturing business by X Corporation does not of itself constitute a failure to carry on substantially the same trade or business even though net operating loss carryovers attributable to the electrical appliance business are used to offset profits of the cement manufacturing business. See, however, section 269 and the regulations thereunder.

[4] Sec. 1.382(a)–1(h)(5) [Income Tax Regs.] In determining whether a corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in the ownership of its stock, all the facts and circumstances of the particular case shall be taken into account. Among the relevant factors to be taken into account are changes in the corporation's employees, plant, equipment, product, location, customers, and other items which are significant in determining whether there is, or is not, a continuity of the same business enterprise. These factors shall be evaluated in the light of the general objective of section 382(a) to disallow net operating loss carryovers where there is a purchase of the stock of a corporation and its loss carryovers are used to offset gains of a business unrelated to that which produced the losses. However the prohibited utilization of net operating loss carryovers to offset gains of a business unrelated to that which produced the losses is not dependent upon considerations of purpose, motive, or intent, but rather is established by the objective facts of the particular case. The principles set forth in this subparagraph shall be applied in accordance with the rules set forth in the following subparagraphs of this paragraph.

[5] S. Rept. No. 1622, to accompany H.R. 8300 (P.L. 591), 83d Cong., 2d Sess. (1954), reads in part as follows:

indicate that the very transaction section 382(a) seeks to prohibit is the stock puchase made "for the purpose of" using a carryover to offset profits of a business unrelated to that which caused the losses. The petitioner's sole business from 1931 until July 1, 1954, when it operated as the William Gerst Brewing Co., Inc., was the manufacture and distribution of beer. Prior to the abandonment of its brewery operations, petitioner had incurred substantial losses for 3 successive years. When the termination of the brewery business occurred, its principal assets consisted of the brewery equipment and the real property which it owned. The brewery equipment was sold, but Gerst was unable to arrange for an advantageous sale of its land and buildings. Consequently, it retained the real property and leased it. There is no doubt that renting property was not one of the business purposes for which Gerst was formed. Its corporate charter was never changed to reflect leasing as a business purpose, although technically under Tennessee law it had the power to rent its realty. But it had no intention of permanently doing so. The property was always for sale.

While it is true that Gerst incurred losses of $6,023.44 in 1955 and $5,112.50 in 1956 from leasing its property, these amounts were small by comparison with the previous losses of $302,069.48 incurred in the brewery operations. Respondent submits, and we agree, that the most reasonable and logical interpretation of the phrase "continued to carry on a trade or business substantially the same," as used in this statutory context, means the *active business*, viz, the manufacture and distribution of beer, which actually incurred the losses. See sec. 1.382(a)–1(h)(6), Income Tax Regs., and compare *Fawn Fashions, Inc.*, 41 T.C. 205, 214 (1963). Gerst Brewing Co. had terminated its regular business activities and the stockholders rented the

Under present law where a controlling interest in a corporation is acquired for the purpose of avoiding or evading tax liabilities the Internal Revenue Service may disallow the benefits of a deduction, credit, or allowance which would otherwise be enjoyed by the acquiring person or corporation. This provision has proved ineffectual, however, because of the necessity of proving that tax avoidance was the primary purpose of the transaction. It has also been so uncertain in its effects as to place a premium on litigation and a damper on valid business transactions.  [p. 53]

\* \* \* \* \* \* \*

SECTION 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS.

\* \* \* \* \* \* \*

It provides that if the corporation has not continued to carry on a trade or business substantially the same as that conducted immediately before any change in the percentage ownership of the fair market value of the stock, the condition in subparagraph (C) is met. The change in percentage ownership refers to an increase which would be counted under subparagraphs (A) and (B) in determining whether the 50 percentage point increase has been reached. If, as a result of such an increase, the corporation shifts from one type of business to another, discontinues any except a minor portion of its business, changes its location, or otherwise fails to carry on substantially the same trade or business as was conducted before such an increase, then the condition in subparagraph (C) is met.  [p. 285]

real property (1) as a step in the process of disposing of all the brewery assets, and (2) as a means of minimizing its losses until an advantageous sale thereof could be arranged. Had it not owned its own real property it would have been completely inactive in 1957. To allow the petitioner the net operating losses merely because it happened to own the property in which it conducted the business for which it was created, but which had been terminated, would confer upon the petitioner benefits wholly beyond the spirit and intendment of section 382(a).

Petitioner argues that the primary, bona fide business purpose in the acquisition of its stock by Trippeer was to supply Euclid with a place to relocate its heavy equipment and machinery business at a time when it looked like Euclid's location would be taken for the construction of a new highway. Nevertheless, it is frankly admitted by petitioner that both Trippeer and Euclid knew about Gerst's prior net operating losses and that the tax advantage was an *inducement* to the purchase of Gerst's stock. It seems to us that the merger of Euclid into South Nashville Properties, Inc. (Gerst), was not necessary because the property acquired by Trippeer through its purchase of Gerst's stock could have been rented by Trippeer to Euclid. This at least casts some doubt on the genuineness of the alleged business purpose for the acquisition of Gerst's stock and the subsequent merger. Certainly the petitioner would be the beneficiary of an artificial tax situation.

There are several objective factors in this case which reflect that the business was in fact substantially changed in such a manner that the petitioner did not continue substantially the same trade or business. The property rentals were very insignificant in relation to the total income derived from the heavy equipment business. The pertinent figures are shown in our Findings of Fact. After the merger, rental income comprised about 1 percent of petitioner's gross income. Although the statute does not define the word "substantial," we think it is safe to say that Congress did not contemplate a ratio of 99 to 1 in favor of the added business.

The basic character of the business was also substantially changed by the addition of new employees, new customers, and the new product—heavy equipment and machinery. The charter of the corporation was likewise changed to correspond with that of the old Euclid-Tennessee, Inc. Other prime factors indicating a change in the business are the change in name and the change in location. The petitioner immediately took the name of the profitable corporation which was absorbed by it. And it continued to operate from the location of the profitable business and adopted this new address as its business address. These facts point to a substantial change in petitioner's business as contrasted with a continuation of substantially the same business.

We have carefully considered the case of *Goodwyn Crockery Co.*, *supra*, which is principally relied upon by the petitioner, but find that it involved a factual situation so different from that present herein that we regard it as distinguishable.

In the *Goodwyn* case, the taxpayer, after the change in ownership, moved its principal office from Memphis, Tenn., to Cairo, Ill., and later to Scottsville, Ky.; experienced a turnover of employees; added a dry goods line to its durable household goods line, which constituted much of its business; began to operate as a retailer in addition to continuing to operate as a wholesaler; and integrated its operations with those of the acquiring corporation. We categorized the issue as requiring "a finding of absence or presence of substantial sameness of the trade or business." Reading the statute literally, we said that there could be some changes in the manner of conducting a trade or business without violating the requirement that the business in question remain "substantially the same." Thus, we found as a fact that, despite the many changes that occurred after the change in stock ownership, the *basic character* of Goodwyn's business remained unchanged, stating:

It did business under the same name in the same area as a seller of general merchandise to the same type of customers.

In essence, this Court held in the *Goodwyn* case that what had taken place was not a change of business but an expansion from a wholesale seller of merchandise to an integrated wholesale-retail organization. The same merchandise was sold in the same area but in a different manner. That, of course, is far different from what we have here—an attempt to offset the losses of a brewery, which had not carried on its normal business activities for 2½ years prior to the sale of its stock, against the profits of a heavy equipment business which was merged into it.

In *Goodwyn* the mere purchase of an additional line of business did not assure that any profits would ever be made to offset against its losses; whereas the merger of the heavy equipment business into the petitioner assured the petitioner of profits so that it could utilize the losses. In *Goodwyn* the addition of the new line of business was directly related to its previously conducted business and there was no change in the name of the company; whereas in this case the heavy equipment business had no direct relation to either the brewery business or the leasing of property. Because of this fact the petitioner changed its name to that under which the heavy equipment business was conducted. Moreover, the leasing of property was insignificant in the overall operations of the petitioner after the merger. This was not true of the additional business added in *Goodwyn*. And, finally, in *Goodwyn* the additional line of business was not previously owned by the same controlling interests; whereas in the instant case Trippeer,

a holding company, owned all the stock of the petitioner and the heavy equipment business which was merged into the petitioner.

After considering the factors previously discussed in the light of section 382(a), we have concluded that the *basic character* of the brewery business, which produced almost all of the losses, was so changed that it did not continue to carry on "substantially the same" business which generated the profits. Unlike the *Goodwyn* case, where a new line of business was added but the old business continued, we simply view the composite facts in this case as clearly demonstrating that the old business—the brewery operations and not the subsequent, insignificant leasing of its industrial property—has not continued substantially unchanged. Accordingly, we sustain respondent's disallowance of the net operating losses.

So holding, we find it unnecessary to decide, as respondent urges us to do, whether the principal purpose of the acquisition by Trippeer of Gerst's stock was to evade or avoid tax under the provisions of section 269(a). See *Federal Cement Tile Co.*, 40 T.C. 1028 (1963), on appeal (C.A. 7, Feb. 17, 1964).

*Decision will be entered for the respondent.*