POWER-LINE SALES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Power-Line Sales, Inc. v. Commissioner
Docket No. 4274-75.
United States Tax Court
T.C. Memo 1977-43; 1977 Tax Ct. Memo LEXIS 394; 36 T.C.M. (CCH) 190; T.C.M. (RIA) 770043; February 23, 1977, Filed *394 Petitioner, successor to Powers Wire Products Co., Inc. (Products), is principally engaged in the business of manufacturing staples and staple guns. Products acquired all the outstanding shares of Sudmeier Enterprises, Incorporated (SEI), a corporation engaged in the oil business. SEI has sustained net operating losses since its inception; Products and its subsidiaries have always been profitable. Ten months following the acquisition, Products' wholly owned subsidiary, Powers Wire Staple Co., Inc. (Old Staple) was merged into SEI; SEI's name concurrently changed to Powers Wire Staple Co., Inc. (New Staple). New Staple claimed as a deduction SEI's net operating losses, sustained prior to the merger. Held, the purpose of Products' acquisition of control of SEI was not the evasion or avoidance of tax contemplated by sec. 269(a). Held further, SEI continued to carry on its trade or business substantially the same as that conducted before its acquisition within the meaning of sec. 382(a) and petitioner is entitled to deduct SEI's net operating losses. *395 William A. Cruikshank, Jr., for the petitioner. Hector C. Perez, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION *396 STERRETT, Judge: Respondent determined a deficiency in the corporate Federal income tax of petitioner, Power-Line Sales, Inc., for its taxable year ended May 31, 1971 in the amount of $108,607. Concessions having been made by the parties, the issues remaining for decision are as follows: (1) Whether the principal purpose motivating petitioner's acquisition of Sudmeier Enterprises, Incorporated, a loss corporation, and the subsequent utilization of its net operating losses through the merger of Powers Wire Staple Co., Inc., a profit corporation, into Sudmeier Enterprises, Incorporated was the evasion or avoidance of Federal income tax within the meaning of section 269, I.R.C. 1954. (2) Whether Sudemeier Enterprises, Incorporated has continued to carry *397 on a trade or business substantially the same as that conducted before it was acquired by Powers Wire Products Co., Inc. within the meaning of section 382(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Power-Line Sales, Inc., is a corporation organized under the laws of the State of California with its principal office in El Monte, California. Power-Line Sales, Inc. is the corporate successor to Powers Wire Staple Co., Inc., to whom the statutory notice of deficiency was also sent, and other affiliated corporations. Powers Wire Staple Co., Inc.'s corporate income tax return for its fiscal year ended May 31, 1971 was filed with the office of Internal Revenue Service at Fresno, California. To unravel the corporate transactions of the aforesaid affiliated corporations involved in the finality of Power-Line Sales, Inc. as the single successor, a brief outline follows: Powers Wire Products Co., Inc. (Products) originated as a partnership in 1945, was incorporated on November 4, 1946 and since 1968 has been solely owned *398 by the Powers brothers, Richard and Merle. It is in the business of manufacturing staples and staple guns with its plant in El Monte, California. Products had a wholly owned subsidiary, Powers Wire Staple Co., Inc. (Old Staple), which was incorporated on August 8, 1962. Old Staple has its plant in North Carolina and is in the business of manufacturing staples. Sudmeier Enterprises, Incorporated (SEI) was a corporation organized under the laws of the State of California on February 26, 1968. Since its inception it has engaged in demonstrations to oil companies and others of an electronic device developed to disclose the location of oil reserves. On or about November 26, 1969 the SEI shareholders accepted an offer whereby Products became the owner of all the outstanding shares of SEI stock, paying a per share cash purchase price of 10 cents or a total of $2,652. After SEI was acquired by Products, it operated as a wholly owned subsidiary of Products. On September 30, 1970 Old Staple was merged into SEI, and SEI's name was concurrently changed to Powers Wire Staple Co., Inc. (New Staple). On December 29, 1972 Products, New Staple and another Products' subsidiary were merged with *399 Products the survivor, its name concurrently changed to Power-Line Sales, Inc. (Power-Line). The facts and circumstances surrounding the acquisition of SEI relevant to the issue at hand are as follows: The specific business in which SEI was primarily to engage was the determining and/or research and development with regard to the determination of the presence of minerals, hydrocarbons and/or any other known basic element of nature.SEI's principal office was at Gardena, California. On May 13, 1968 SEI acquired a license, by assignment, to make, use and sell an electronic device designed to detect underground reserves of oil and other hydrocarbons by passing this device horizontally through space above the surface of the ground. This license was granted by Subsurface Surveys (Subsurface) to Gus H. Sudmeier (Sudmeier) on February 1, 1968, who in turn assigned it to SEI. The license agreement executed by Subsurface, as grantor, and Sudmeier, as licensee, provided, in part, that Subsurface held all patent rights of the pending patent applications to this device; that it granted to Sudmeier the exclusive worldwide rights and license thereof for the life of the patents to be subsequently *400 issued, or in the event that no patents were issued, then for a term of not less than 10 years with an option of an additional 10 years. [1] A royalty clause gave Subsurface 2 percent of Sudmeier's gross receipts on all products and services sold therefrom. Sudmeier was granted the right to assign the license agreement without the consent of Subsurface, subject to such assignee assuming the obligations therein. Additionally paragraph 5 of the agreement provided: 5. If Licensee shall fail to pay Grantor the royalties payable under the terms hereof, or if Licensee shall violate, or fail to keep or perform any other obligation, term or condition hereof, or if Licensee shall be adjudged a bankrupt, or make an assignment for the benefit of creditors, or be placed in the hands of a receiver or trustee in bankruptcy, then, upon the happening of any one or more of such events, Grantor may, at its option, cancel and terminate this Agreement by giving Licensee sixty (60) days written notice, specifying the default complained of; provided, however, that if Licensee shall within suxh sixty (60) days cure the default complained of, then, and in that event, said notice shall cease to be operative *401 and this Agreement shall continue in full force and effect as though such default had not occurred; and provided, further, that if Licensee shall within such sixty (60) days notify Grantor in writing that it disputes the asserted default, the matter shall be submitted to arbitration as hereinafter provided. Also this agreement provided that if the licensee made no commercial use of the licensed products or any claims of an issued patent thereunder for a period of a calendar year, the grantor shall have the right to cancel the license upon 60 days written notice to the licensee. As a result of obtaining the license, SEI acquired certain equipment from Subsurface for $17,000. In essence such equipment was the electronic device and hardware associated therewith along with two four-wheel drive jeeps. The device is about 3 feet high by 4 feet long and 2 feet deep. It can be mounted comfortably in a four-wheel drive jeep.
From its original issue of 26,520 shares of stock (17,680 shares for cash of $176,800 and 8,840 shares as promotional stock for services) in July 1968, until its acquisition by Products *402 in November 1969, SEI had approximately 20 shareholders including Richard and Merle Powers. Each of the Powers brothers purchased 500 shares of stock for $5,000 and thus acquired approximately 2.8 percent of the total outstanding shares that had been issued for cash or 1.885 percent of the total outstanding shares. Prior to their investment in SEI, the Powers brothers had no contacts with the oil business. Before investing in its stock the Powers brothers witnessed successful demonstrations of the electronic device in proven oil fields. SEI contacted all the major oil companies in an effort to promote the device. However the industry's response was that the effectiveness of the device had not been shown by a record of successful wells drilled on the basis of information disclosed by the device. The oil industry had been exposed to many similar devices and was reluctant to accept SEI's. Accordingly SEI proceeded to drill a well with its own funds, the site determined on information obtained from the device. The well was successful and produced more than 300 barrels a day for over three months. Net income from the well was approximately $30,000 per month. The oil industry *403 thought SEI's success was a fluke and would not accept the accuracy of the device. Hence a limited partnership was formed to drill a second well. SEI was the general partner with the limited partners being the shareholders of SEI. Again the well hit, produced oil for a limited time and then became a good gas producer. However, when the oil rigging on well number one was moved to the second well site, the first well head was damaged and the well stopped producing oil shortly thereafter. SEI's share of the income from the gas well was not significant. SEI drilled a third and fourth well prior to its acquisition by Products. In each instance there was the presence of oil but not in commercial quantities. By 1969 SEI had depleted its operating funds. Its first oil well was damaged and not producing, and the oil industry had not employed SEI's device in its drilling operations. SEI attempted, but was unsuccessful, to sell additional stock to its present shareholders and/or new sources. On March 21, 1969 the Powers brothers arranged for their corporation, Products, to lend $75,000 to SEI. The loan was to be repaid in 5 months with interest at 10 percent per annum. The loan *404 was evidenced by a promissory note dated March 21, 1969 and a security agreement dated March 17, 1969. The security agreement gave Products a security interest in (1) SEI's machinery and equipment; (2) SEI's accounts receivable; and (3) all proceeds from SEI's accounts receivable then existing or hereafter arising. Further, SEI assigned to Products its interest in an oil, gas and mineral lease designated as Township 29 South, Range 26 East MDB&M, Section 33: SW/4 of SE/4 but reserved all its interest in such lease until such time as it shall be in default of any of the terms of this security agreement. SEI was unable to pay when the loan became due in August of 1969. SEI had previously, again, attempted to sell additional stock to repay its indebtedness. It also approached Products seeking additional funds, by way of loan or otherwise, without success. Instead, Products on October 3, 1969 offered to purchase all of the outstanding stock of SEI at 10 cents per share. Products had considered the possibility of foreclosing upon their security interest in SEI's assets. However the Powers brothers believed that this electronic device had tremendous profit potential, and the security *405 agreement did not cover the patent license agreement on this device. The Powers brothers believed SEI's rights under such license were not assignable under the aforenoted terms of the license agreement. Therefore to secure their rights to all SEI's assets, including the patent license, Products decided to acquire the stock of SEI instead of foreclosing under its security agreement and purchasing the remaining assets of SEI. By November 26, 1969 Products' offer was accepted, and it became the owner of all the outstanding shares of SEI stock. Products also advanced an additional loan of $5,000 to enable SEI to meet its pressing obligations. On September 23, 1969 the Powers brothers were elected to the board of directors of SEI effective October 7, 1969. Prior to this time they had not been active in SEI's day-to-day affairs and kept abreast of its affairs only by attending shareholders' meetings and conversing with other shareholders. Products, and not the Powers brothers, acquired SEI because the brothers felt they did not have sufficient cash to finance the activities of SEI necessary to promote and market the electronic device successfully. The Powers brothers were aware that *406 SEI had suffered large operation losses from the date of its incorporation until Products acquired control. The presence of these losses did not prompt them to seek tax advice. They were aware that the SEI losses could be applied against its future earnings but unaware, at the date Products acquired control of SEI, that SEI's losses could be applied against the profits of another company. Consequently at date of acquisition, the Powers brothers did not intend to have Products or any of its affiliates, other than SEI, make use of the preacquisition SEI operating losses. On May 28, 1970 the Powers brothers attended a meeting with their tax attorney, C.P.A. and their controller. At this meeting their attorney suggested that it might be possible to merge SEI with another of their affiliated companies so that the losses of SEI could be offset against the profits of another corporation. Prior to the meeting the Powers brothers had not contemplated nor entertained any idea of the use of SEI's losses against the profits of another related corporation. On September 30, 1970 Old Staple, the wholly owned and profitable subsidiary of Products, was merged into SEI, and SEI's name was concurrently *407 changed to Powers Wire Staple Co., Inc. (New Staple). After the acquisition of control of SEI by Products, SEI continued to carry on substantially the same business, albeit somewhat more vigorously than it had been conducted prior to such acquisition. SEI retained its key employees. Its president, Adrian Scott, was retained and did not leave SEI until March 1973. Bill Jolley, its electronics expert, was retained until the end of 1972. Also Wally Stromeyer, its equipment operator, was with SEI until 1971. SEI's offices at Gardena were moved to Products' offices at El Monte, and Products' machine shop and staff were made available to SEI. After Products acquired control SEI drilled six more wells in reliance on evidence provided by the electronic device. All six wells showed petroleum deposits present but not in commercial quantities. After the 1970 merger, SEI (now New Staple) continued to carry on its oil related operations substantially as before the merger. On February 28, 1973 Power-Line sold all of the assets relating to the oil activities of SEI to the Powers brothers. The Powers brothers have since attempted, without success, to prove the merits of this electronic *408 device. The premerger operations of Old Staple and SEI to September 30, 1970, the date of the merger, are as follows: Taxable Income (Loss)
Old Staple
S.E.I.
fiscal Year Ended
Fiscal Year Ended
April 30
May 31
1968
$149,895
No Activity
1969
471,821
[182,990)
1970
351,912
( 84,622) *
1970 (6/1/70-
85,786
( 26,673)
9/30/70)
Post-merger operations of New Staple follows: Staple Operations
Oil Operations
1971 (10/1/70 -
5/31/71)
$314,073
[53,383)
1972
391,033
(91,412)
6/1/72 - 2/28/73
368,698
(73,615)
Pre-merger sales follows: Sales
Old Staple
S.E.I.
Fiscal Year Ended
Fiscal Year Ended
April 30
May 31
1968
$1,910.568
No Activity
1969
2,428,690
$100,184.65
1970
2,285,431
30,256.00
1970
1,059,064(to 9/30/70)
6,425.00
Post-merger sales of New Staple follow: Staple Operations
Oil Operations
1971 (10/1/70-5/31/71)
$1,759,671
$12,837
1972
3,319,310
8,102
6/1/72-2/8/73
3,733,706
3,578
*409 Loans to SEI from Products as of September 30, 1970 totaled $163,097. The loans were made in the amounts and during the periods as follows: Period
Amount
March, 1969
$ 75,000
October, 1969
5,000
10/69-11/30/69
11,409
12/1/69-5/31/70
33,230
6/1/70-9/30/70
38,458
$163,097
For the fiscal year ended May 31, 1971 New Staple realized net income of $234,017 before deduction of the net operating loss of $267,612 carried from SEI's two preceding years. New Staple thus reported a net loss of $33,595 and paid no tax. In his notice of deficiency dated March 6, 1975 respondent disallowed the deduction of the net operating loss carryover of $267,612 under the provisions of section 269 or section 382(a). OPINION Issue 1: Section 269(a)
The issue existing under section 269(a), [2] whether petitioner's principal purpose in acquiring the stock of SEI was avoidance of federal income tax, is a factual one. Our inquiry must be focused upon all the circumstances surrounding the acquisition of control and we must make a subjective evaluation of petitioner's motives. Glen Raven Mills, Inc.,59 T.C. 1 (1972).In order for section 269(a) to be *410 applicable, the tax evasion or avoidance motive must be the principal purpose for the acquisition, such purpose outranking or exceeding in importance, any other one purpose. S. Rept. No. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 973, 1017. Commodores Point Terminal Corporation,11 T.C. 411, 416 (1948). The burden rests upon petitioner to prove by a preponderance of the evidence that the avoidance of tax was not the principal purpose. Capri, Inc.,65 T.C. 162 (1975); American Pipe & Steel Corp. v. Commissioner,243 F.2d 125 (9th Cir. 1957), affg. 25 T.C. 351 (1955). Appeal lies in this case to the Ninth Circuit, and both parties agree that the critical date for determining the purpose of acquisition of control is the date of acquisition. Hawaiian Trust Company Limited v. United States,291 F.2d 761 (9th Cir. 1961); [3]Jack E. Golsen,54 T.C. 742 (1970) affd. 445 F.2d 985 (10th Cir. 1971); see also Capri, Inc.,supra at 179. In Hawaiian Trust Company Limited, the Ninth Circuit stated at page 768: The determining factor, however, *411 is the intention or purpose of Refiners at the time of acquisition. Refiners having acquired control of Hilo Gas for business reasons alone and without considering the tax aspects of the transaction, the intention or purpose "for which (such) acquisition was made" would not be changed from a business into a tax evasion purpose when it subsequently ascertained the tax consequences of the transaction. [Emphasis supplied] *412 Respondent submits that, where the acquisition and the next step necessary to gain the benefit of the tax loss (the merger) involve two separate steps, we may properly find that the two steps were a part of a preconceived plan, considering evidence of a tax avoidance motive at the time of the merger to infer petitioner's state of mind at date of acquisition. Since the second step, use of the loss, begets the very question at issue, we do not see how its presence adds anything. To cite it as a probative fact smacks of bootstrapping. Under any circumstance, in cases such as these the testimony of the acquiring corporation's top management is of particular importance. D'Arcy-MacManus & Masius, Inc.,63 T.C. 440 (1975). Here, both Powers brothers, the shareholders of Products, testified and we find their testimony to be forthright and credible as to the motives behind Products' acquisition of the stock of SEI. Although both knew that SEI had incurred large tax losses and that such losses could be used against any future SEI profits, they were unaware that it was possible for another of their affiliated corporations to utilize these losses. They did not seek tax *413 advice at the time of acquisition and only when counsel some 7 months later suggested the merger to utilize these losses did the Powers brothers become aware of this possibility. Prior to its acquisition SEI drilled four wells, based on information obtained from the electronic device, each hitting oil but not in commercial quantities. The Powers brothers remained very optimistic concerning the profit potential inherent in this device and caused Products to purchase the SEI stock. The acquisition of the stock was necessary, in their minds, to acquire the patent rights and license to the device. While we agree with respondent that the record indicates the Powers brothers did not personally know whether a patent was issued (they relied upon the inventor's word), that they did not consult an attorney to get advice on the status of the licensing agreement, and that none of SEI's drilling hit wells of commercial quantity, their imprudent business judgment does not alter our conclusion, after careful scrutiny of the entire record, that business and not tax avoidance considerations principally motivated the acquisition.[4]
*414 Issue 2: Section 382(a)
Unlike section 269(a), section 382(a)(1) provides an objective test for the disallowance of net operating loss carryforwards. "* * * the prohibition against the use of the loss carryovers is not dependent upon purpose or intent." Goodwyn Crockery Co.,37 T.C. 355, 362 (1961) affd. 315 F.2d 110 (6th Cir. 1963). There is no dispute that there was a necessary change in ownership to cause the change of ownership requirement of section 382(a) to be applicable. The only issue existing under section 382(a) is section 382(a)(1)(C) [5]--whether SEI (whose name was changed to New Staple after the merger) continued to carry on a trade or business substantially the same as that conducted before its acquisition. Under Jack E. Golsen,supra, we are bound to the Ninth Circuit's decision in Maxwell Hardware Company v. Commissioner,343 F.2d 713, 719 (9th Cir. 1965) that "Congress has deliberately sanctioned such so called 'trafficking' [in loss carryovers] in those situations where it is not expressly abjured." In other words, Congress when enacting section 382(a) intended that the test of that *415 section apply and not the doctrine promulgated under Libson Shops, Inc. v. Koehler,353 U.S. 382 (1957). Under the operation of section 382(a)(1)(C) the issue is not whether the business is carried on in substantially the same manner, but rather whether it is substantially the same business. Goodwyn Crockery Co., supra at 362. "* * * it would appear that there has to be a real change in the type of business conducted to come within this statute." H.F. Ramsey Co.,43 T.C. 500, 514 (1965). *416 Furthermore, "the addition by the corporation of a new trade or business does not constitute a failure to carry on substantially the same trade or business." Section 1.382(a)-1(h)(8), Income Tax Regs; [6] See also Euclid-Tennessee, Inc.,41 T.C. 752, 758 (1964) affd. 352 F.2d 991 (6th Cir. 1965). *417 Both parties rely upon section 1.382(a) - 1(h)(5), Income Tax Regs. in support of their positions. The regulation lists the following factors as relevant to a determination whether a corporation has changed its business: a change in the corporation's employees, plant, equipment, product, location, and customers. Respondent also relies upon our opinion in Euclid-Tennessee, Inc.,supra at 760 where we state that another prime factor would be a change in name of the loss corporation. We have previously found that the basic character of the oil business, which produced the losses, was not changed. The key employees of SEI remained with the company after acquisition, and it continued to promote the electronic device to anyone who seemed interested. Six additional wells were drilled after Products acquired control.Although we have found that SEI's office was moved from Gardena to Products' offices at El Monte, that concurrently with the merger SEI's name was changed, and that its new stationery bore no indication that New Staple was in an oil related business as well as the business of nailers, staplers and hog ringers, we believe in the instant case such factors have slight *418 significance when determining the issue of whether it was continuing the same business. Moving its office to a different location within the same state is of "scant significance" inasmuch as its business was the promotion of its electronic device to the oil industry wherever they may be located. Goodwyn Crockery Co.,supra at 363. Furthermore, when the stock of SEI was acquired by Products, SEI retained its name without change until the date of the merger, approximately nine months later. The case law in this area does not require that "after the change of ownership, a corporation's overall operations must be such as to be in total 'substantially the same trade or business' as theretofore carried on." Rather our inquiry is whether "such corporation (the taxpayer) [has or] has not * * * continued to carry on a trade or business substantially the same as that conducted before any change * * *." Euclid-Tennessee, Inc. v. Commissioner,352 F.2d 991, 994 (6th Cir. 1965). Finally we note that the Tax Reform Act of 1976, 90 Stat. 1520, P.L. 94-455 amended section 382(a) effective for changes in stock ownership in taxable years beginning *419 after June 30, 1973. In part, under such amendments, the same trade or business requirement of 382(a)(1)(C) was deleted, and as such, if the Act was applicable to this case, the net operating loss carryovers would not be allowed as a net operating loss deduction to petitioner. The Senate Finance Committee Report on P.L. 94-455 specifically stated that the present rules under 382(a) (prior to the enactment of P.L. 94-455) fail to cover some transactions where "trafficking" in loss carryovers can still occur. S. Rept. No. 94-938 (Part I), to accompany H.R. 10612, (P.L. 94-455), 94th Cong., 2nd Sess. 201 (1976). Speaking to the continuance of a same business test, the Committee stated at page 202: * * * this test has also been difficult to apply in specific cases, i.e., it has been difficult for taxpayers and for the courts to determine at what point a change in merchandise, location or size of the business should be treated as a change in the business in some cases, the new owners have been permitted to add a different business to the old business, so that the impact of the existing rule is further diluted. Addressing section 269, which the Act did not amend, the Committee stated *420 at page 206: The general tax avoidance test.--The committee has not amended section 269 of present law because the application of this general disallowance provision should be retained for transactions not expressly within the fixed rules as changed by the amendment. Section 269 is retained, for example, to deal with "built-in loss" transactions and other exchanges or transfers which are apparent devices to exploit continuing gaps in the technical rules for tax avoidance purposes. The committee believes, however, that section 269 should not be applied to disallow net operating loss carryovers in situations where part or all of a loss carryover is permitted under the specific rules in section 382, unless a device or scheme to circumvent the purpose of the carryover restrictions appears to be present. Accordingly, we hold that section 382(a) is also inapplicable to the facts of this case by reason of the fact that the oil related business of SEI was pursued substantially the same after the acquisition of SEI as before, within the meaning of subparagraph (1)(C) of the foregoing section. Decision will be entered for the Petitioner. Footnotes
1. The record implies, but does not establish, that a (patents) was granted.↩
*. Of this amount, $39,866 was for the six months ended November 30, 1969 and $44,756 was for the six months ended May 31, 1970.↩
2. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General.--If-- * * *
(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. ↩
3. This case was decided under sec. 129(a), I.R.C. 1939. which is substantially identical to its successor sec. 269(a), I.R.C. 1954↩.
4. Our finding that Products principally acquired SEI for a valid business reason meets any burden placed upon petitioner by sec. 269(c). H.F. Ramsey Co.,43 T.C. 500↩ (1965).
5. SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS. (a) Purchase of a Corporation and Change in its Trade or Business. - (1) In General.--If, at the end of a taxable year of a corporation-- * * *
(C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.↩
6. This legislation states: Sec. 1.382(a) - 1(h)(8). If, after an increase in ownership, the corporation continues to carry on its prior business activities substantially undiminished, the addition by the corporation of a new trade or business does not constitute a failure to carry on substantially the same trade or business. This subparagraph may be illustrated by the following example: Example. X Corporation, a calendar-year taxpayer, is engaged in the manufacture and sale of electrical appliances and has sustained substantial net operating losses. On June 30, 1958, Y Corporation purchased 100 percent of X Corporation's outstanding stock. During 1959, X Corporation continues substantially undiminished its activities in the manufacture and sale of electrical appliances and also diversifies its activities by acquiring a cement manufacturing plant. The addition of the cement manufacturing business by X Corporation does not of itself constitute a failure to carry on substantially the same trade or business even though net operating loss carryovers attributable to the electrical appliance business are used to offset profits of the cement manufacturing business. See, however, section 269↩ and the regulations thereunder.